THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD COCHRAN, Defendant-Appellant.

Fourth District   No. 4—88—0175

Opinion filed January 19, 1989.

730

J. Steven Beckett, of Beckett & Crewell, of Champaign, for appellant.

Roger Simpson, State's Attorney, of Monticello, for the People.

JUSTICE KNECHT delivered the opinion of the court:

A Piatt County circuit court jury convicted defendant Richard Cochran of the aggravated battery of Michael Pace in violation of section 12—4(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 12—4(a)). The court sentenced him to 18 months' probation, payment of a $500 fine and court costs, and restitution of the victim's lost wages. Defendant was further ordered to receive counseling and to serve five days' imprisonment subject to work release. Defendant appeals, raising issues of reasonable doubt, sufficiency of instructions, and prejudicial testimony.

The events occurred at defendant's residence, where he lived with his wife Darla and their son. Cecilia Bohlen lived next door, where a wedding reception was held on the evening of August 8, 1987. Present at the reception were Pace, his wife Rebecca, Daniel Reynolds, and his fiancee, Teresa Bohlen, who is Rebecca Pace's sister. Cecilia Bohlen is Rebecca's and Teresa's aunt.

Daniel Reynolds testified while walking to his truck at about 8:30 or 9 p.m. following the reception, he heard someone say, "call the law" from near the Bohlen residence. As he approached the Bohlen residence in his truck, he slowed in order to pick up Teresa, who stopped Reynolds and spoke to him. Reynolds exited his vehicle and proceeded to the Cochran side of the fence between the two properties.

He observed Michael Pace between defendant and Darla, who stood against the fence. Defendant angrily yelled at Pace to stay out of it, that it wasn't any of his affair. Darla told defendant to leave her alone and to leave the premises. Defendant leaned in toward Pace with a pushing motion, hands waist-to-chest high, at a speed between a walk and a run. Pace then struck defendant in the jaw, and both men went to the ground.

Reynolds testified once he separated the two men, defendant and Pace faced each other, standing about 3 to 3½ feet apart. Pace faced Reynolds and defendant's back was to Reynolds. When Pace "hesitated" and looked to his right, his arms and hands to his sides, defendant hit Pace in the eye. Pace fell on his back. Defendant then jumped on Pace. Reynolds testified defendant's knee-to-shoulder area landed on Pace. Reynolds again separated the men. Reynolds estimated from the time he broke up the first fight until defendant hit

Pace, one to three minutes elapsed. Once Reynolds let defendant up, defendant walked to the back of the Cochran yard to speak to Rebecca Pace.

On cross-examination, Reynolds testified he and Pace had consumed beer and food at the wedding reception. He saw no physical violence between defendant and Darla during the incident.

On redirect, Reynolds testified that during the second scuffle, he stood 3½ to 4 feet behind defendant, facing the same direction. Pace stood facing defendant.

Teresa Bohlen, now Teresa Reynolds, testified she had gone into her aunt's house to retrieve her purse prior to leaving. While walking through the living room, she heard someone say, "Becky, help me. Becky, help me." She did not recognize the voice, but knew it came from the Cochran's. Walking onto the front porch, she saw Darla against the fence with defendant in front of her. Darla's head leaned back over the top of the fence. Defendant's arms were extended in the vicinity of Darla's neck. Teresa could not see defendant's hands.

Teresa testified Pace ran toward the fence and Reynolds approached in his truck. She saw Pace run around the end of the fence into the Cochran yard. Teresa ran to the truck and told Reynolds defendant and Pace were "into it."

Teresa stated Pace stood between defendant and Darla, off to one side. Reynolds was also present. Pace, defendant, and Darla were yelling. Rebecca Pace and Teresa took Darla into the Bohlen home and called police. Teresa exited the house, then stood in the driveway to observe. She looked away from the scene and, when she looked back, defendant was on top of Pace.

After again entering and exiting the house, Teresa saw Reynolds on top of defendant, holding him down. When Reynolds released defendant, defendant repeatedly stated he wanted to talk to Rebecca. Rebecca and defendant walked toward the rear of defendant's house.

After examining Pace's injury, Teresa walked toward the back of defendant's house and, at a distance of five to six feet, overheard a conversation between Rebecca Pace and defendant.

"STATE'S ATTORNEY: What did you hear?

DEFENSE COUNSEL: Objection, Judge. Again, can we approach the Bench?

(Side bar held out of the hearing of the court reporter.)

THE COURT: Objection overruled. She may answer.

Q. What did you hear, Mrs. Reynolds?

A. I overheard Becky asking Rick why did he always hit Darla, why did he always beat on her, and Rick replied that—

DEFENSE COUNSEL: Objection to what Becky said. I think I can do that. That's hearsay.

STATE'S ATTORNEY: I don't think the conversation makes any sense with just one side of it.

THE COURT: Overruled. She may continue.

A. Rick replied, she just makes me so mad, Becky. She just makes me so mad."

On cross-examination, Teresa stated she saw no blows. She, Reynolds, and Pace drank beer at the reception. The area in which the men fought was illuminated by a streetlight and by the Bohlen porch light. She could not see defendant's hands when defendant and Darla were at the fence, but stated defendant's elbows were up. Darla's head was bent over the fence, which came up to about Darla's mid-shoulder blade. Teresa testified defendant was not lifting Darla up. On redirect, Teresa stated no more than a minute elapsed from the time she stepped out onto the driveway until she saw Pace and defendant scuffling on the ground.

Michael Pace testified he left the reception with Rebecca at dusk. The Bohlen garage and back porch lights were on. While getting into his car, parked in the Bohlen driveway, he heard a female voice say, "Help, help Becky, help" from the Cochran yard. Pace saw Darla up against the chain link fence. Darla's head was bent back over the top of the fence. Defendant had his hands around Darla's neck, putting pressure on her. Pace testified Darla shook back and forth in a rocking motion trying to get away.

Pace estimated he was 20 to 30 feet away. He ran to the Cochran side of the fence. He saw defendant's hands on Darla's neck, but stated it did not seem like defendant was trying to choke her. Pace stepped between defendant and Darla. Defendant backed off and faced Pace. Darla moved behind Pace next to the fence. Defendant stated angrily that it was none of Pace's business and told him to get out. Pace said he couldn't do that. Darla said, "Rick why don't you just get the hell out of here." Pace testified defendant's expression became angrier at that point. Defendant and Pace stood about three feet apart.

Pace testified defendant took a quick step—between a run and a walk—toward him. Defendant's arms were coming up. Pace stood still, with his open hands to his sides. Pace felt threatened and struck defendant in the mouth with his fist. Pace did not see Darla at that point but felt that her presence kept him from leaving since she would have had no protection.

Defendant said, "What did you do that for?" several times. Pace's

open hands were at his side. Pace did not move or speak in the 30 to 45 seconds between the first and second blows. Pace testified he looked to the left, toward the Bohlen home, to see if Darla was still at the fence. He was then hit near his right eye. Pace said he did not see who or what hit him. He fell flat on his back and felt a body land on his collarbone area. When he opened his eyes, he saw defendant on top of him. They struggled on the ground, at which time Pace realized he had been injured. He was later treated for a broken collarbone.

On cross-examination, Pace stated that though he lost sight of Darla, he assumed Darla was still present after he stepped between the Cochrans, so he felt he could not leave. He did not see Darla until she told defendant to leave. After Darla told defendant to leave, defendant's arms came up when he stepped toward Pace. He did not see Teresa or Rebecca take Darla away. Pace estimated he had consumed five to six beers that night. Pace stood 5 feet 11 inches tall and weighed 164 pounds. He stated there was no streetlight illuminating the area of the fight. He stated the fence between the Cochran and Bohlen properties measured about four feet high. When Pace first saw the Cochrans, Darla's head was bent completely back over the fence and Pace could see her eyes. He could not tell if her feet were off the ground.

On redirect, Pace estimated defendant's size at 5 feet 10 inches tall and 165 pounds. Pace testified that during the incident he said only two things to defendant—the initial, "Hey, what's going on here," when he encountered the Cochrans, and "I can't do that" when defendant told him to leave.

Rebecca Pace testified she was sitting in her car preparing to leave the wedding reception when she heard a voice calling, "Help. Help Becky. Help me." It was loud and came from the direction of the Cochran residence. Rebecca saw Darla pushed against the fence, her head "pointed back" over the fence. Defendant was up against her. Becky could not see defendant's hands. Darla appeared to be shaking back and forth. When Rebecca reached the scene, defendant was telling Pace to leave. Defendant stood three feet in front of Pace. Darla was behind Pace and to his left.

Rebecca stated when defendant took a step toward Pace and Darla, Rebecca took Darla by the arm and said, "I think you should come with me." Rebecca did not see what happened after defendant stepped toward Pace. Along with Teresa, Rebecca and Darla went to Bohlen's house, where Rebecca called the sheriff at Darla's request. After the scuffle, Rebecca and defendant walked toward the rear of the Cochran house.

Defendant said he wanted to go in the house and get some things. Rebecca suggested he wait until things calmed down, since Darla did not want defendant to be at the house. Rebecca said that since the sheriff had been called, it would be better if defendant left. The testimony continued:

"STATE'S ATTORNEY: What, if anything, did he say then?

A. He also told me that he wanted to talk to Darla, and I said no, she is afraid of you right now, and he couldn't understand why [she] would be afraid of him, and I said you hit her, and he told me—

DEFENSE COUNSEL: Object to this line of questioning. I think it is irrelevant to the issues before the jury today.

THE COURT: No. I see the relevance. Overruled.

Q. What else did he say, Mrs. Pace, at that point?

A. I told him that if he didn't hit her, she wouldn't be afraid of him, and he said that whenever he tried to talk to her, he just lost control, that he just lost it, and about that time, my sister came up to me."

Rebecca stated Teresa approached her and defendant, stating Pace was hurt and needed to go to the hospital. Over defendant's objection, Rebecca testified defendant laughed and said, "Good, I'm glad."

On cross-examination, Rebecca stated that she had two drinks during the reception. Pace drank some beers. During the incident, she heard defendant tell Pace to leave, that it was none of his business. Pace replied, "I can't do that." She testified defendant yelled at Pace, and Darla yelled at defendant. She testified she took Darla away when she saw defendant step toward Pace.

Defense counsel asked Rebecca if she told Darla that if Darla took defendant's side in the case, Rebecca would have nothing more to do with her. Rebecca responded that defendant and Darla had physical violence in their past plus divorce proceedings pending. She indicated that if Darla returned to defendant, Rebecca would feel as though Darla was placing herself in jeopardy and Rebecca could not afford to be Darla's friend and worry about her. Defense counsel then asked, "So you are telling me, it didn't have anything to do with this case?" After the State objected, the judge allowed Rebecca to answer. She stated, "It wasn't just this case. It did have something to do with this case."

On redirect, the subject of the Cochrans' relationship surfaced again:

"STATE'S ATTORNEY: What did that—you indicated that

had something to do with this case, and it didn't have something to do with this case, kind of both. What did it have to do with this case?

A. I was upset at the fact that we had to get involved with them, because we thought that Darla was going to get hurt. That wasn't the first time that something happened like that, that I knew of.

DEFENSE COUNSEL: Object to that statement, and ask that it be stricken, that the jury be admonished—instructed not to consider that.

THE COURT: Overruled. It will stand."

The defense presented two witnesses. Darla Cochran testified she and her husband argued on the way home from a party that evening. She and defendant were separated and Darla had filed for divorce, but it had not been finalized at that time. Once home, Darla told defendant to leave. They were near the fence. Darla testified defendant held her arm, picked her up by the hips, and started hugging her and laughing. Darla denied she had her head over the fence or her body pinned against the fence. Pace arrived and asked what the problem was. Defendant stated there was no problem.

Darla testified she told her husband to get out. She went next door and sat on the steps. She saw no scuffling, though later, upon exiting the Bohlen home, she saw Reynolds had defendant in a headlock. She denied that after Pace arrived, and before she left the scene, defendant grabbed her arm. She stated when she was in the Cochran house with Reynolds and defendant after the incident, defendant was very loving, and she was sympathetic. She told him since the police had been called, he should leave.

On cross-examination, Darla admitted she and defendant were trying to reconcile. In her statement to the police, written the day after the incident, Darla stated she was afraid defendant would hit her. She yelled, hoping someone would stop him from hurting her. At trial, she testified she was still angry when she wrote the statement.

Defendant took the stand in his own defense. He described himself as 5 feet 11 inches tall and 147 pounds. He drank three beers at a tavern and two beers at a party before returning home at about 8:45 p.m. He stated he and his wife argued in the car and arrived home at about 9 p.m. He stated Darla was angry. After they walked to the side yard, he grabbed her by the arm. Darla yelled for help. Defendant testified he picked Darla up, laughing and hugging her, trying to settle her down.

Defendant testified Pace and Reynolds came over. Pace asked

what the problem was. Defendant said there was no problem and asked Pace to leave. Rebecca and Teresa took Darla next door. At trial defendant denied pinning Darla to the fence, denied having his hands around her neck, and denied pushing her head back over the fence. He stated the fence was five feet high.

Defendant denied yelling at Pace or walking toward him. He said while he was talking to Reynolds, Pace suddenly punched him. The men hit the ground. After Reynolds broke them up, Pace said, "You think you are pretty bad with them boots on." Defendant testified he thought Pace was going to hit him again, so he struck Pace. They fell again. Reynolds jumped on defendant, hands at throat, and threatened to kill defendant. Between the two punches, 30 seconds elapsed. Defendant testified that after the incident, he walked to the rear of the yard near his house and told Rebecca he could not understand why Darla got so mad when they were trying to get back together.

On cross-examination, defendant stated that between the time Pace hit him and the time he struck Pace, Pace walked toward defendant from about three feet away. Pace's arms were halfway up, but defendant could not see if Pace's fists were clenched. Defendant acknowledged his statement to police did not state Pace threatened or came at him but that Pace "kept pushing the issue."

On January 22, 1988, the jury found defendant guilty. The court denied defendant's post-trial motion February 22, 1988. This appeal followed.

Defendant initially argues the State did not prove beyond a reasonable doubt that defendant was unjustified in using force in self-defense. The State maintains there was sufficient evidence to convict.

■■ The offense of aggravated battery is defined in section 12—4(a) of the Code: "A person who, in committing a battery, intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated battery." Ill. Rev. Stat. 1987, ch. 38, par. 12—4(a).

■■ Use of force in defense of a person is defined as follows:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1987, ch. 38, par. 7—1.

■ Self-defense is an affirmative defense (Ill. Rev. Stat. 1987, ch. 38, par. 7—14), which means that unless the State's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, must present "some evidence" thereon. (Ill. Rev. Stat. 1987, ch. 38, par. 3—2(a); *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31.) Once the issue of self-defense is interposed by the introduction of some evidence, the State has the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense. Ill. Rev. Stat. 1987, ch. 38, par. 3—2(b).

■ It is a defendant's perception of the danger, and not the actual danger, which is dispositive. The issue is whether the facts and circumstances induced a reasonable belief that the threatened danger, whether real or apparent, existed. The reasonableness of the defendant's subjective belief that he was justified in using the force is a question of fact for the trier of fact to determine. A reviewing court will not disturb that determination unless the evidence is palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory that it justifies entertaining a reasonable doubt of the defendant's guilt. *People v. Sawyer* (1986), 115 Ill. 2d 184, 193-94, 503 N.E.2d 331, 336, *cert. denied* (1987), 482 U.S. 930, 96 L. Ed. 2d 702, 107 S. Ct. 3216.

Where the evidence is conflicting, it is the prerogative of the trier of fact to ascertain the truth, and a reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence and the credibility of the witnesses. *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320.

■ In order to justify the use of force in defense of a person, defendant must satisfy the six elements set forth in *People v. Williams* (1965), 56 Ill. App. 2d 159, 205 N.E.2d 749. These elements are:

"(1) [T]hat force is threatened against [the] person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable." *Williams*, 56 Ill. App. 2d at 165, 205 N.E.2d at 752.

■ Applying this test to the facts presented here, even if defendant actually believed a danger existed, defendant did not demonstrate that the use of force was necessary to avert it or that the kind and amount of force used were necessary given the situation at hand. The

issue here is not whether Pace was justified in punching defendant, but whether defendant was justified in striking Pace. The evidence showed that after Pace struck defendant, the two men stood apart, facing each other. Reynolds testified Pace was looking away from defendant when he was hit. Defendant then jumped on Pace. Defendant stated he thought Pace was going to hit him again. However, even if defendant's version were to be believed, defendant lost his justification for self-defense by jumping on Pace, who had already been flattened by defendant's blow.

Defendant's escalation of force is similar to that in *People v. Ranola* (1987), 153 Ill. App. 3d 92, 505 N.E.2d 1191. In *Ranola*, a jury convicted defendant of the aggravated battery of a jewelry store owner. Defendant claimed he acted in self-defense, stating that the owner touched the defendant, a wrestling match ensued, the owner bit and gouged defendant's face, and defendant in self-defense grabbed an object from the floor and repeatedly hit the owner on the head with it. The appellate court affirmed, holding the jury could reasonably have believed defendant's acts were not necessary to avoid death or great bodily harm. The court stated that even if the defendant's version were to be believed, the defendant lost his justification by beating the owner repeatedly, given the absence of reasonable apprehension of threat of force that would result in death or great bodily harm. Here, defendant did not indicate he feared for his safety after he struck Pace and Pace fell to the ground. As a result, defendant failed to show reasonable apprehension of the threat of force that would cause great bodily harm, and thereby lost his justification for jumping on Pace.

Whether defendant's use of force constituted justifiable self-defense is a question for the trier of fact. (*People v. Bingham* (1979), 75 Ill. App. 3d 418, 394 N.E.2d 430.) The jury could have chosen not to believe defendant's version of the incident. The question of whether the injuries rise to the level of great bodily harm is also a question for the trier of fact. (*People v. Jordan* (1981), 102 Ill. App. 3d 1136, 430 N.E.2d 389.) Here, the evidence is not contrary to the verdict or so unreasonable, improbable, or unsatisfactory that a reasonable doubt of defendant's guilt is raised.

■ Defendant next contends the trial court erred in instructing the jury on the issue of self-defense. Defendant claims the second paragraph of the instruction was inapplicable. The State maintains no error occurred.

Illinois Pattern Jury Instructions, Criminal, No. 24—25.06 (2d ed. 1981) (IPI Criminal 2d), states:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [(himself) (another)] against the imminent use of unlawful force.

[However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent (imminent death or great bodily harm to himself or another) (the commission of a forcible felony).]"

The committee note to instruction No. 24—25.06 indicates the second paragraph should be used when there exists "sufficient evidence that the force used by the defendant was likely to cause death or great bodily harm." (IPI Criminal 2d No. 24—25.06, Committee Note, at 554.) The second paragraph of instruction No. 14A as given to the jury read: "However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent great bodily harm to himself."

Defendant contends the second paragraph should be given only when the evidence shows the existence of deadly force. Defendant also argues the second paragraph misled the jury by focusing its attention on whether defendant intended to cause great bodily harm. The State asserts the instruction given by the court was correct.

The plain language of the instruction refutes defendant's argument. The second paragraph is to be used when the evidence shows the existence of force intended or likely to cause death or great bodily harm. The instruction is not confined to circumstances in which a defendant intends to inflict great bodily harm if his actions are likely to cause that type of harm. The phrase "great bodily harm" in No. 24—25.06 defines the type of force used by defendant, not his mental state. *People v. McDaniel* (1984), 125 Ill. App. 3d 694, 466 N.E.2d 662.

Furthermore, infliction of great bodily harm is an element of the offense of aggravated battery. (Ill. Rev. Stat. 1985, ch. 38, par. 12—4(a).) The evidence here entitled defendant to a self-defense instruction. Failure to have included the second paragraph of the instruction would have removed from the jury's consideration the justifiable use of the force which is the basis for the charge. We find no error occurred.

Defendant finally contends the references to his relationship with Darla were prejudicial and erroneously admitted. The State maintains the statements were properly admitted or, at most, harmless error.

■ Evidence that is otherwise relevant will not be excluded simply because it tends to prejudice the accused. (*People v. Davis* (1986), 151 Ill. App. 3d 435, 502 N.E.2d 780.) Where the issue of self-defense has been raised, defendant's state of mind at the time of the occurrence is relevant and material. *People v. Currie* (1980), 84 Ill. App. 3d 1056, 405 N.E.2d 1142.

■ Defendant's argument centers on testimony by Teresa Reynolds and Rebecca Pace. Teresa's testimony concerned a conversation immediately following the incident during which Rebecca asked defendant why he always hit his wife. Defendant replied, "She just makes me so mad, Becky. She just makes me so mad." Testifying about the conversation, Rebecca stated defendant wanted to talk to Darla, but she advised against it, telling defendant Darla would not be afraid of him if he would not hit her. Defendant said whenever he tried to talk to his wife, he lost control. Both statements indicate defendant's state of mind. The evidence shows defendant asked to talk to Rebecca after the scuffle. They immediately walked back to the rear of the Cochran house. The time between the onset of the incident, when Darla called for help, and the talk with Rebecca was shown to be a matter of minutes at most. Defendant's statement that Darla made him so mad indicated defendant's anger at the time.

Rebecca's testimony about the incident's effect on her friendship with Darla does not implicate defendant's state of mind. Defense counsel initiated questioning on the subject during cross-examination. On redirect, the State asked the witness to explain what she stated on cross-examination. The testimony, therefore, was a continuation of a line of questioning begun by defendant. An accused cannot complain of the admission of testimony invited by his own trial tactics. Any error was invited by defendant's conduct. *People v. Jones* (1983), 119 Ill. App. 3d 615, 628, 456 N.E.2d 926, 936-37; *People v. Chitwood* (1986), 148 Ill. App. 3d 730, 499 N.E.2d 992.

For the above reasons, we affirm the trial court.

Affirmed.

LUND and SPITZ, JJ., concur.