(64 P.3d 444)
No. 87,788

STATE OF KANSAS, *Appellee*, v. DEREK DWAYNE BRICE, *Appellant*.

Opinion filed February 28, 2003.

*Shawn Minihan*, assistant appellate defender, and *Randall Hodgkinson*, deputy appellate defender, for appellant.

*Steven W. Wilhoft*, county attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before GERNON, P.J., KNUDSON, and LARSON, S.J.

LARSON, J.: Derek Dwayne Brice appeals his jury conviction of severity level 4 aggravated battery, K.S.A. 21-3414(a)(1)(A), contending the trial court erred (1) when it instructed the jury that great bodily harm occurs when a person sustains a "through and through bullet wound," (2) when it refused to give instructions for severity levels 7 and 8 aggravated battery, and (3) when it refused to allow him to present the testimony of a physician. Brice further contends the totality of the circumstances prejudiced him and denied him a constitutionally fair trial.

Although the facts surrounding the gunshot wound inflicted by Brice upon Ivory Kelly are central to the issues raised by this appeal, they are not greatly in dispute. Simply stated, Brice had replaced Kelly in a relationship with a woman named Nichole Kendrick and was driving one of Kelly's cars. Although Kendrick and Kelly had lived together for a number of years and had three chil-

dren, Brice's driving of any of Kelly's cars was at the crux of the dispute which led to the shooting in issue.

Kendrick testified that Kelly did not like Brice, had threatened to "kick his ass," and had told her not to allow Brice to drive any of the three cars that Kelly and Kendrick owned together. Kelly worked two jobs to afford the cars and was insistent that Brice should not be driving them.

In February 2001, Kendrick and Brice dropped off one of the cars at Kelly's house to use while another car needed repairs. Kelly asked Kendrick about her allowing Brice to drive his car, and Kendrick ignored him. Kelly then went to a Save-A-Lot store to buy food for the children and observed Brice and Kendrick in the parking lot. An argument occurred between Kelly and Kendrick concerning Brice and the cars. Kelly instructed Brice to give Kendrick the keys to the car so she could take the children home.

As Kendrick left the parking lot, Kelly walked toward the store and Brice. When they were approximately 2 feet apart, Brice shot Kelly with a 9mm handgun. The bullet entered Kelly's upper right thigh and exited his buttocks.

Kendrick took Kelly to the Parsons Hospital emergency room. The treating physician, Dr. Myers, testified at trial that the bullet missed the bone, major arteries, veins, and nerves. Dr. Myers said the wound was cleaned but not stitched closed because closing the wound would increase the chance for infection. He specifically testified "that it was a through and through injury."

Kelly was kept overnight at the hospital and checked by Dr. Myers the following day for circulation in the leg. He was given pain medication and released. Kelly said he limped for approximately 1 week but did not use crutches. He missed a week and a half of work and has a scar at both the entry and exit points.

Brice turned himself in to the police approximately 10 hours after the shooting. He was given a *Miranda* warning and consented to an interview. He told Detective Gofourth, who testified at trial as to the conversation, that Brice said Kelly and Kendrick pushed and grabbed each other at the store, which led to an altercation between Kelly and himself. Brice said Kelly knocked the car keys

from his hand and struck him. Brice said he "just blacked out" and did not know if he shot Kelly or not.

During a second interview, Brice told the detective he shot Kelly because he was afraid of him. He admitted to obtaining a 9mm gun because of this fear. The gun had been given to Kendrick and was not located. Kendrick exercised her Fifth Amendment rights at trial when questioned about the gun. It was established at trial that Kelly was a much larger man than Brice and had played linebacker on a high school football team in Louisiana where Brice and Kelly had known each other.

In addition to Dr. Myers' testimony, Officer Riley and Kelly testified in the State's case in chief that the bullet entered Kelly's upper right thigh and exited through his right buttock. After the State rested, Brice moved for a judgment of acquittal on the ground that the State had failed to prove that Kelly had sustained great bodily harm.

The majority of the Kansas cases involving the difference between "bodily harm" and "great bodily harm" were discussed and argued. Brice's contention that he was entitled to lesser included instructions on level 7 and level 8 aggravated battery was considered. In addition, there was the question of whether Brice would be allowed to call a physician he had not previously designated as a witness who was expected to testify that Kelly's gunshot wound resulted only in "bodily harm" and not "great bodily harm" and there was no disfigurement.

Included in the discussion was the question of whether this was a multiple acts situation which required an instruction on that question. This is not an issue on appeal.

Eventually, the trial court held that "bodily harm" or "great bodily harm" is a determining factor as to the severity level of aggravated battery and the court was obligated to determine "as a matter of law" if great bodily harm occurred in order to classify the crime charged and properly instruct the jury. The court discussed the severity and location of the wounds in other Kansas cases and noted that Kelly's wound was not one which just grazed the skin. Thus, the court concluded that there was a factual issue as to whether it was "great bodily harm" or only "bodily harm."

The trial judge decided that the State's evidence clearly established that the gunshot wound constituted "great bodily harm" and he was obligated to so find as a matter of law and to give the jury a definitional instruction that a "through and through bullet wound is great bodily harm as a matter of law."

Once this question was resolved, the court held that disfigurement was not an issue in the case and that the testimony of Brice's medical expert, Dr. Miller, was not necessary. Defense counsel proffered Dr. Miller's expected testimony, stating he was a surgeon who served in the Vietnam war; he currently practices with Dr. Myers, the treating physician, and had reviewed Kelly's medical records. According to Dr. Miller, Kelly did not sustain great bodily harm or disfigurement because the scars left by the bullet were similar to scars after a child falls off a bicycle. The defense argued that Dr. Miller's testimony was necessary but the trial court's ruling had removed the possibility that Dr. Miller could offer any meaningful evidence.

The court reviewed the jury instructions. It agreed it should give a self-defense instruction. The defense again requested instructions for the lesser included forms of aggravated battery and objected to the definition of great bodily harm as being a "through and through bullet wound." The court declined to give instructions on severity levels 7 and 8 (bodily harm) aggravated battery and determined it would instruct the jury that the term "great bodily harm" meant a "through and through bullet wound." Instructions were to be given on severity levels 4 and 5 (intentional and reckless) aggravated battery where great bodily harm existed.

Brice rested without calling any witnesses. In closing, he argued that he did not intentionally shoot Kelly and did not intend to cause any harm to Kelly. The defense also argued Brice acted in self-defense because Kelly had threatened him, Kelly was much physically larger and stronger than he was, and he was afraid of Kelly.

The jury found Brice guilty of level 4 (intentional) aggravated battery. Motions for downward dispositional and durational departure were denied, and Brice was sentenced to the mid-range guidelines sentence of 41 months in the custody of the Secretary of Corrections. This appeal followed.

Brice's first three issues on appeal are interrelated as each one involves the legal differences between bodily harm and great bodily harm under K.S.A. 21-3414, the instructions to be given, and admissibility of expert testimony. We will discuss all three issues as they relate to each other, the statutory language in issue, and the evidence in this case. Different standards of review are applicable, which we first summarize:

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Mitchell*, 269 Kan. 349, 355, 7 P.3d 1135 (2000).

In considering whether a lesser included offense instruction is required, *State v. Valentine*, 260 Kan. 431, 434, 921 P.2d 770 (1996), a case we will later discuss in great detail, teaches us:

"A defendant has a right to an instruction and the trial court has a duty to instruct on a lesser included offense which is supported by substantial evidence. *State v. Cummings*, 242 Kan. 84, 91, 744 P.2d 858 (1987). 'Where there is no substantial evidence applicable to the lesser degrees of the offense charged, and all the evidence taken together shows that the offense, if committed, was clearly of the higher degree, instructions relating to the lesser degree of the offenses are not necessary.' *Gibbons*, 256 Kan. at 955."

We further look to the extensive discussion in *State v. Smallwood*, 264 Kan. 69, 80-81, 955 P.2d 1209 (1998), as to the proper tests for admission of expert testimony in criminal actions and on appeals therefrom:

"The admissibility of expert testimony is within the broad discretion of the trial court. A party claiming an abuse of trial court discretion bears the burden of showing abuse of discretion. [Citations omitted.]

"The basis for the admission of expert testimony is necessity arising out of the particular circumstances of the case. To be admissible, expert testimony must be helpful to the jury. . . .

"No error in either the admission or the exclusion of evidence by the court is a ground for granting a new trial or for setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. K.S.A. 60-261; *State v. Morris*, 255 Kan. 964, Syl. ¶ 6, 880 P.2d 1244 (1994).

"An appellate court's review of the trial court's admission of evidence is a two-step process. First, it must determine whether the evidence was admissible or inadmissible. Then, if the evidence was improperly admitted, it must determine whether to apply the harmless error rule of review or the federal constitutional error rule to the erroneous admission of that evidence.

"Under the federal constitutional error rule, an error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. McClanahan*, 259 Kan. 86, Syl. ¶ 4, 910 P.2d 193 (1996)."

Although we may at times consider cases which involve aggravated battery as statutorily defined prior to July 1, 1993, the language of our present statute which became effective as of that date is central to our appeal and reads in its entirety as follows:

"(a) Aggravated battery is:

(1)(A) Intentionally causing great bodily harm to another person or disfigurement of another person; or

(B) intentionally causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted; or

(C) intentionally causing physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted; or

(2)(A) recklessly causing great bodily harm to another person or disfigurement of another person; or

(B) recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted.

"(b) Aggravated battery as described in subsection (a)(1)(A) is a severity level 4, person felony. Aggravated battery as described in subsections (a)(1)(B) and (a)(1)(C) is a severity level 7, person felony. Aggravated battery as described in subsection (a)(2)(A) is a severity level 5, person felony. Aggravated battery as described in subsection (a)(2)(B) is a severity level 8, person felony. A person convicted of aggravated battery shall be subject to the provisions of subsection (h) of K.S.A. 21-4704 and amendments thereto." K.S.A. 21-3414.

While much of our opinion in *State v. Ochoa*, 20 Kan. App. 2d 1014, 1019, 895 P.2d 198 (1995), was disapproved by the Supreme Court in *State v. Valentine*, 260 Kan. at 435, which we will later discuss in detail, the following chart, which is found in our *Ochoa*

opinion, sets forth the various elements of each subsection and the applicable severity levels in a clear understandable manner:

"

| (a)(1)(A) level 4 | (a)(1)(B) level 7 | (a)(1)(C) level 7 | (a)(2)(A) level 5 | (a)(2)(B) level 8 |
|---|---|---|---|---|
| Intentionally causing | Intentionally causing | Intentionally causing | Recklessly causing | Recklessly causing |
| Great bodily harm or disfigurement | Bodily harm with a deadly weapon or in any manner whereby great bodily harm, disfigurement, or death can be inflicted | Physical contact done in a rude, insulting, or angry manner with a deadly weapon or in any manner whereby great bodily harm, disfigurement, or death can be inflicted | Great bodily harm or disfigurement | Bodily harm with a deadly weapon or in any manner whereby great bodily harm, disfigurement, or death can be inflicted |

"

The distinctions in the elements are clearly shown above. If the defendant causes great bodily harm or disfigurement, the applicable severity level is 4 if the acts are deemed to be intentional or severity level 5 if deemed to be reckless. If only bodily harm is inflicted on the victim, the applicable severity level is 7 if intentionally caused or severity level 8 if recklessly caused. Because the question of disfigurement did not become a jury question, the three issues we face focus on the differences between "bodily harm" and "great bodily harm."

In *Ochoa*, the gunshot wounds which were the basis for the aggravated battery charges included a wound that had entered the abdomen and gone out the back but hit no vital organs, a shot in both calves, and a small bruise; we held that severity levels 5, 7, and 8 aggravated battery are included offenses of level 4 aggravated battery and under the facts the trial court committed reversible error in failing to instruct the jury on severity levels 5, 7, and 8 aggravated battery as defined by K.S.A. 1994 Supp. 21-3414(a)(1)(B), (a)(2)(A), and (a)(2)(B). 20 Kan. App. 2d 1014, Syl.

¶¶ 3, 4. This holding was disapproved in *State v. Valentine*, as we previously stated.

In *State v. Valentine*, the victim Ross was shot by Valentine first in the arm and later by three or more shots, one of which severed Ross' spine and paralyzed him from the waist down. After Valentine was convicted of a level 4 aggravated battery, he argued on appeal that the trial court erred in failing to instruct the jury on level 7 aggravated battery. The lesser instruction had not been requested in *Valentine* (as it was in our case), but Justice Abbott's unanimous opinion stated the failure to give the level 7 aggravated battery instruction was neither erroneous nor clearly erroneous. After setting forth the standard of review which we repeated herein, the *Valentine* opinion quoted from the *Ochoa* opinion but then made a clear ruling which is directly applicable to and binding on us in this case.

"In making his argument that a lesser included offense instruction for severity level 7 aggravated battery should have been given, the defendant relies on *State v. Ochoa*, 20 Kan. App. 2d 1014, 895 P.2d 198 (1995). This case found that severity level 7 aggravated battery is a lesser included offense of severity level 4 aggravated battery. 20 Kan. App. 2d at 1020.

"In so holding, the Court of Appeals stated:

'[A] level 4 aggravated battery is proven by showing that defendant *intentionally* caused *great bodily harm* to the victim. It is difficult to envision how the State could prove a level 4 aggravated battery without necessarily proving a level 7 aggravated battery. A level 7 aggravated battery under 21-3414(a)(1)(B) is shown by proof that a defendant *intentionally caused bodily harm* to a victim with a deadly weapon or in any manner whereby great bodily harm, disfigurement, or death can be inflicted.

'It appears inescapable to us that in proving great bodily harm in a level 4 charge, the State must necessarily prove bodily harm. The only difference between a level 4 aggravated battery and a level 7 aggravated battery is whether defendant intended to inflict *great* bodily harm or disfigurement or merely intended to inflict *bodily harm*, but in a manner "whereby great bodily harm, disfigurement or death can be inflicted." In proving both charges, the State must prove that defendant intentionally inflicted bodily harm. In addition, in this case, the State's evidence was that defendant intentionally inflicted bodily harm with a deadly weapon.

'*In this case, the question of whether the bodily harm inflicted was great was a question for the jury. We reject the concept that the trial court may decide, in every case, as a matter of law whether the bodily harm inflicted was or was not great.* In the instant matter, the victim certainly suffered bodily harm. He suffered

a gunshot wound to the abdomen. Whether this was merely bodily harm or great bodily harm was a matter to be decided by the jury. The State, in attempting to prove that defendant intentionally inflicted great bodily harm, necessarily was required to prove that defendant intentionally inflicted bodily harm. We hold that proof of a level 4 aggravated battery necessarily proves a level 7 aggravated battery as defined by 21-3414(a)(1)(B). A level 7 aggravated battery is an included crime of a level 4 aggravated battery, and the trial court erred in failing to instruct the jury on the level 7 aggravated battery. The evidence in this case would support a conclusion that defendant intentionally inflicted great bodily harm on the victim with a deadly weapon or that defendant intentionally inflicted bodily harm on the victim with a deadly weapon. *Whether the harm was great or not was a question of fact to be decided by the jury.*' (Emphasis added.) 20 Kan. App. 2d at 1019-20.

"We disagree with the Court of Appeals. In *Ochoa*, the victim received a 'through and through' bullet wound. The bullet entered the victim's stomach and exited through his back without hitting any vital organs. A 'through and through' bullet wound in the abdomen does not present a question of fact as to whether it is mere bodily harm or great bodily harm. This constitutes great bodily harm. See *State v. Whitaker*, 260 Kan. 85, 917 P.2d 859 (1996). There may be instances where a bullet wound is not 'great' bodily harm when, for example, it grazes the skin, but we cannot envision a 'through and through' bullet wound, as occurred in *Ochoa*, that does not amount to great bodily harm. That part of *Ochoa*, inconsistent with this opinion, is disapproved. As such, we have no difficulty in finding that a bullet wound which severs the spinal cord and causes paralysis, a much worse wound that a through and through bullet wound, qualifies as great bodily injury as a matter of law. The trial court did not err when it did not give an instruction on level 7 aggravated battery. The defendant was either guilty of level 4 aggravated battery or not guilty." 260 Kan. at 434-35.

Based on the clear language of *Valentine* and the testimony of Dr. Myers, Riley, and Kelly, the "through and through" bullet wound in our case must be considered to amount to great bodily harm as a matter of law and lesser included instructions of severity levels 7 and 8 "bodily harm" aggravated battery were not appropriate or required.

The *Valentine* opinion points us to *State v. Whitaker*, 260 Kan. 85, 917 P.2d 859 (1996), which although primarily a sentencing case contained the following discussion of great bodily harm:

"Our criminal code does not define great bodily harm. In *State v. Dubish*, 234 Kan. 708, 715, 675 P.2d 877 (1984), this court stated:
'Bodily harm has been defined as "any touching of the victim against [the victim's] will, with physical force, in an intentional hostile and aggravated manner." [Citation omitted.] The word "great" distinguishes the bodily harm necessary in

[the offense of aggravated battery] from slight, trivial, minor or moderate harm, and as such it does not include mere bruises, which are likely to be sustained in simple battery.'

See *People v. Lopez*, 222 Cal. Rptr. 83, 176 Cal. App. 3d 460 (1986) (through and through gunshot wound to thigh was great bodily injury for enhancement statute); *cf. People v. Watkins*, 243 Ill. App. 3d 271, 277-78, 611 N.E.2d 1121 (1993) (no great bodily harm for aggravated battery conviction where bullet only grazed victim and did not draw blood).

"Whether bodily harm is great is generally a question of fact for the jury, not the trial judge. See *State v. Sanders*, 223 Kan. 550, 552, 575 P.2d 533 (1978); *State v. Ochoa*, 20 Kan. App. 2d 1014, 1020, 895 P.2d 198 (1995). Here, however, where the determination of great bodily harm is made in the context of classifying the severity level of a crime, the trial judge is required to explore that question and determine if great bodily harm occurred.

"Did great bodily harm occur? The facts indicate that Neal had an intent to cause great bodily harm. The police officer received a 'through and through' wound to his right arm, although a more damaging injury could have occurred had the officer been hit in a more vital area of his body or if the bullet had struck a bone. The officer missed 3 days of work as a result of his injury. The officer here suffered more than a mere bruise or scratch. The sentencing judge properly classified Whitaker's offense as a severity level 3 crime based on the intent to cause great bodily harm." 260 Kan. at 93-94.

The language in *Whitaker* makes it clear that in the context of classifying the severity level of a crime the trial judge is required to explore the question and make a determination from the facts or testimony. *Whitaker* can be expanded in its reasoning or limited in its holding to only sentencing matters. A similar sentencing case involving this same issue is *Doolin v. State*, 24 Kan. App. 2d 500, 947 P.2d 454 (1997), where a store clerk was shot with an assault rifle in the calf, upper right leg, and left hip. It was found as a matter of law the bullet wounds were "through and through" wounds and serious enough to constitute great bodily harm requiring the assignment of a severity level 4 to the aggravated battery offense.

The most recent case involving K.S.A. 21-3414, *State v. Moore*, 271 Kan. 416, 23 P.3d 815 (2001), is more directly involved with the "disfigurement" language of the statute. There were numerous charges in the *Moore* case, but the Supreme Court considered only the Court of Appeals' reversal of an aggravated battery conviction

based on the trial court's refusal to give a lesser included offense instruction on simple battery.

*Moore's* facts showed a domestic dispute where the defendant grabbed a hot iron from the victim, burned her legs, lifted her shirt and burned her breast, and then dropped the iron between her legs, burning her inner thighs. Photographs taken approximately 4 weeks after the incident showed burn marks on the victim's legs, breast, and inner thigh. The trial court found that disfigurement existed as a matter of law.

The *Moore* opinion first stated that while simple battery involves only bodily harm, aggravated battery involves great bodily harm or disfigurement on which the jury was instructed. It was noted that where a consideration of all the evidence showed that the offense, if committed, was clearly of the higher degree, instructions on lesser degrees of the offense are not necessary. *State v. Gibbons,* 256 Kan. 951, 955, 889 P.2d 772 (1995). *Moore* further said that

" '[d]isfigurement' has no single technical meaning or single definition and should be considered in the ordinary sense. [Citation omitted.] When an injury has been established, the question of whether it constitutes great bodily harm or disfigurement is normally a question to be determined by the trier of fact. *State v. Kelley,* 262 Kan. 755, 761, 942 P.2d 579 (1997)." 271 Kan. at 421.

However, the *Moore* opinion then stated:

"In a limited number of cases, this court has held that certain injuries constitute great bodily harm as a matter of law. See *State v. Whitaker,* 260 Kan. 85, 93-94, 917 P.2d 859 (1996) (holding that a through and through bullet wound constituted great bodily harm); *State v. Valentine,* 260 Kan. 431, 435, 921 P.2d 770 (1996) (holding that a bullet wound which severed the spinal cord and caused paralysis constituted great bodily harm as a matter of law); *State v. Doolin,* 24 Kan. App. 2d 500, 503-04, 947 P.2d 454 (1997) (holding that bullet wound which required a hip bone and hip socket to be replaced constituted great bodily harm as a matter of law)." 271 Kan. at 419-20.

The *Moore* opinion noted, as we have said, that while *Valentine* directly involved the question of whether a lesser included instruction should have been given, both *Whitaker* and *Doolin* related to the correct classification for criminal history purposes and not to the fact that jury determination had not been possible. *Moore* further observed that in *State v. Gideon,* 257 Kan. 591, 614, 894 P.2d

850 (1995), it was held that rape or aggravated sodomy constitutes great bodily harm as a matter of law.

The *Moore* opinion then summarized the victim's injuries, stated they were not trivial or minor, said the question was whether a reasonable jury could have found the injuries constituted only "moderate" harm, and then held:

"We conclude, based on the evidence presented, including the photographs, that no reasonable jury could have found the injuries to constitute moderate harm. Rather, the offense if committed, was clearly of the higher degree, and the trial court did not err in failing to give an instruction on the lesser offense of simple battery, as there was simply no evidence from which a reasonable jury could have convicted the defendant of that offense. See *Gibbons*, 256 Kan. at 955." 271 Kan. at 421.

We likewise conclude that based on the evidence before the trial court, the offense, if committed, was clearly either a severity level 4 (intentional) or level 5 (reckless) aggravated battery based on great bodily harm resulting from the "through and through bullet wound" as a matter of law. The evidence excluded any theory of guilt of aggravated battery of the lesser severity levels. It was not error to refuse to give instructions relating to severity levels 7 and 8 aggravated battery. The holdings and logic of *Whitaker, Valentine,* and *Moore* clearly support our decision.

We next move to the closely related question. If it is necessary for the trial court to consider the evidence and find that a through and through gunshot wound has been inflicted on the victim and the Kansas Supreme Court has legally defined this as constituting great bodily harm, why is it not proper to so instruct the jury? Logic would tell us this is nothing more than providing an applicable definition for the jury's usage in considering all of the instructions.

Brice argues strenuously that when the jury was instructed "[a]s used in these instructions the term, Great Bodily Harm means a 'through and through bullet wound,' " as stated in instruction No. 14, this violated his constitutional rights by not requiring every element of the crime charged to be proven beyond a reasonable doubt and created a mandatory presumption which removed a required element from the case in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000);

*Francis v. Franklin*, 471 U.S. 307, 85 L. Ed. 2d 344, 105 S. Ct. 1965 (1984); *Sandstrom v. Montana*, 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979); and *In re Winship*, 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970).

The State asks us to look at all of the instructions, especially No. 8, which stated:

"The defendant is charged with the crime of level 4 aggravated battery.

"The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant intentionally caused great bodily harm to another person, to-wit: Ivory Kelly; and

"2. That this act occurred on or about the 11th day of February, 2001, in Labette County, Kansas."

The State contends this instruction and No. 14 read together correctly state the law, did not relieve the State of proving every element of the charges, and did not establish an impermissible mandatory presumption. It further contends that *Apprendi* is basically not applicable to our factual situation because it relates to an increase in the maximum penalty to be imposed without a proper jury finding which exists in our case.

When we look at all of the jury instructions in this case as *Mitchell* teaches us to do, we find the elements of level 4 and level 5 aggravated battery which are required to be proved beyond a reasonable doubt are correctly set forth in instructions Nos. 8 and 10. Instruction No. 11 relates to Brice's claim of self-defense and is clearly stated. The next two instructions, Nos. 12 and 13, are essentially definitional instructions, as is the complained-of instruction No. 14 regarding the through and through bullet wound.

Instruction No. 12 reads: "As used in these instructions, the term Intentional Conduct means, conduct that is purposeful and willful and not accidental. The terms 'knowing,' 'willful,' 'purposeful,' and 'on purpose' are included within the term 'intentional.' "

Instruction No. 13 reads:

"As used in these instructions, the term Reckless Conduct means, conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger. The

terms 'gross negligence,' 'culpable negligence,' 'wanton negligence' and 'wantonness' are included within the term 'recklessness' as used in this code."

Instruction No. 14 is tailored specifically to the facts of our case but is much like the myriad of definitional instructions we find in PIK Crim. 3d 53.00 which suggests in presenting "definition and explanation of terms" to a jury that the following prefatory language be used: "As used in these instructions the term . . . (means) (includes) . . . ." PIK Crim. 3d 53.00 then lists 110 terms, beginning with "accessory" and ending with "written instrument." Some are statutorily defined. Others have definitions resulting from decisions in appellate cases.

PIK Crim. 3d 56.04 contains homicide definitions for maliciously, premeditation, willfully, intentionally, heat of passion, and reckless. Most are based on statutes or appellate decisions. The "(means) (includes)" suggestion in PIK Crim. 3d 53.00 allows the definition to be tailored to the facts of the case. If multiple wounds were inflicted in different ways the word "includes" would be proper. In our case, only the gunshot wound was involved, and the guidance given to the jury by the definition instruction was clearly proper.

We do not agree with Brice's argument that a definitional instruction like No. 14 in our case creates a conclusive mandatory presumption in violation of *Franklin* or *Sandstrom* or relieves the State of the burden of proving every element of the crime beyond a reasonable doubt in violation of *Winship*. Every element of the crime charged remained to be proved beyond a reasonable doubt. It is not improper or unconstitutional to give a jury a proper definitional instruction as was done in our case.

There were questions of whether Brice's actions were intentional, reckless, accidental, or even justified. He presented a plausible theory that his actions were only taken in self-defense, and the jury was so instructed. The trial court recognized the clear appellate authority from opinions of the Kansas Supreme Court in *Valentine, Whitaker,* and *Moore* and properly instructed the jury that as a matter of law, a through and through gunshot wound could constitute great bodily harm.

*Apprendi v. New Jersey* has been discussed in great detail in numerous Kansas cases and by the recent article in the Kansas Bar Journal, Sittenauer, *Surviving Apprendi: A Procedural Ideal Meets the Real World of Determinate Sentencing*, 72 J.K.B.A. 44 (2003). Simply stated, it involves sentencing for actions not found by a jury beyond a reasonable doubt and is not applicable to our factual situation.

We hold it was not reversible error for the trial court to give instruction No. 14.

The final question in the trilogy of Brice's issues relating to the trial court's decisions relates to the testimony (or rather the lack thereof) of Dr. Miller.

Although the State argued at the trial that Dr. Miller should not be allowed to testify because he had not been disclosed as a witness as a part of reciprocal discovery, that is not the question on appeal. Brice contends his constitutional rights were violated by the trial court's refusal to allow Dr. Miller to testify. The State now argues that the trial court's ruling did not disqualify Dr. Miller but that Brice elected not to call him as a witness.

We have examined the proffer of Dr. Miller's expected testimony and hold that Brice did not voluntarily elect not to call Dr. Miller and a clear issue exists on appeal as to whether he should have been allowed to testify.

It is necessary to first note that the statutory elements for the aggravated battery charge include both great bodily harm and "disfigurement." K.S.A. 21-3412. Had "disfigurement" or the lack thereof, continued to be a question the jury was required to determine, Dr. Miller's opinion that no "disfigurement" existed would clearly have been admissible evidence. By his proffer, he was prepared to testify that the small scars Kelly suffered did not result in disfigurement.

However, the State did not rely on "disfigurement," and it was not a part of instruction No. 8 which we previously set forth in its entirety. As the court said during the extended discussion we previously referred to, only great bodily harm was involved. When the prosecuting attorney said, "[W]e do not need to do disfigurement," the trial court answered, "Right. Disfigurement is not really a ques-

tion." With disfigurement not relevant, Dr. Miller's opinion as to whether it existed would not have been admissible.

The other testimony that Dr. Miller was expected to give from the proffer was that he had extensive experience with gunshot wounds and the one experienced by Kelly did not amount to great bodily harm. This would not have been admissible.

As we said in setting forth the standards of review, a trial court has wide discretion in permitting opinion testimony. But, as is clearly stated in Barbara, *Kansas Criminal Law Handbook* § 21.4 (3d ed. 1992): "Generally, courts will not permit the expert witness to testify to 'legal' conclusions as opposed to factual conclusions. The legal conclusion is within the trial court's obligation to instruct the jury on the law that applies and the verdict is left to the jury . . . ."

The locations of the entry and exit gunshot wounds were not a part of Dr. Miller's expected testimony, and he would not have been entitled to opine as a matter of law something the Kansas Supreme Court had held to be a contrary legal conclusion.

Based on the proffer, the specific issues in the case, and the inadmissible legal conclusions that Dr. Miller would have been asked to give, it was not erroneous for the trial court to rule that his expected testimony would not provide admissible evidence. The trial court's ruling was not erroneous.

With the conclusions we have reached on Brice's first three issues, his argument that cumulative errors deprived him of a constitutionally fair trial has no merit. We find no trial errors upon which such a claim could be predicated. Further, an examination of the record clearly shows Brice was given a vigorous defense. The trial may not have been perfect, but it was certainly a fair one.

Affirmed.

KNUDSON, J., dissenting in part and concurring in part:

I must respectfully dissent from the majority's holding that the trial court did not err when it instructed the jury "As used in these instructions, the term Great Bodily Harm means, a 'through and through bullet wound.'" Candidly, the majority's holding is logical and an understandable expansion in light of the holdings in *State*

*v. Valentine*, 260 Kan. 431, 921 P.2d 770 (1996), and *State v. Whitaker*, 260 Kan. 85, 917 P.2d 859 (1996). However, I cannot help but recall that "[t]he life of the law has not been logic: it has been experience." Holmes, The Common Law, p. 1 (1881).

Both *Valentine* and *Whitaker* concerned issues of law for a judge to decide, not factual issues that would impermissibly invade the province of a jury to decide in a criminal trial. In *Valentine*, the court considered whether there was substantial competent evidence in the record to support the giving of an instruction for the lesser included offense of a level 7 aggravated battery. In *Whitaker*, the determination of whether great bodily harm had occurred was within the context of classifying the severity level of a crime under the Kansas Sentencing Guidelines Act.

In *United States v. Mentz*, 840 F.2d 315, 319 (6th Cir. 1988), the court stated:

> "The Sixth Amendment to the Constitution guarantees to a defendant the opportunity for a jury to decide guilt or innocence. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). A necessary corollary is the right to have one's guilt determined only upon proof beyond the jury's reasonable doubt of every fact necessary to constitute the crime charged."

The United States Supreme Court has held that a defendant has a right under the Fifth and Sixth Amendments to the United States Constitution to have a jury determine guilt beyond a reasonable doubt on *every element* of a charged offense. *United States v. Gaudin*, 515 U.S. 506, 510, 132 L. Ed. 2d 444, 115 S. Ct. 2310 (1995).

I would hold Instruction No. 14 violates Brice's Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution. This instruction effectively relieves the State of its burden of proof and constitutes a mandatory presumption on an essential element of a level 4 aggravated battery. The majority astutely recognizes the weakness of its holding if the element of "great bodily harm" is indeed removed from deliberation by the jury. To avoid such a conclusion, the majority opines: "Logic would tell us [Instruction No. 14] is nothing more than providing an applicable definition for the jury's usage in considering all of the instructions." I do not agree.

Instruction No. 14 removes from jury consideration whether the State proved great bodily harm beyond a reasonable doubt. That decision was made by the trial court and effectively eliminated the defendant's right of trial by jury on that element of the crime.

Finally, I fear the implications of the majority's holding. Why stop with defining great bodily harm as a through and through bullet wound? In almost every case where there is no substantial competent evidence to support the giving of a lesser offense, under today's holding, the trial court would appear to be free to craft a definition of great bodily harm that would be fact specific and pass constitutional muster.

In summary, the majority's holding blurs the line between fact questions for the jury to decide and legal questions for the trial court to decide. This holding nullifies the constitutional require-ment that a jury decide whether the State has proven beyond a reasonable doubt each fact necessary to constitute the crime charged.

For the foregoing reasons, I respectfully dissent from the second holding within the syllabus but do concur with the balance of the court's holdings.