THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. XAVIER WATKINS, Defendant-Appellant.

First District (2nd Division)   No. 1—91—2049

Opinion filed February 16, 1993.—Rehearing denied March 17, 1993.

Rita A. Fry, Public Defender, of Chicago (Elyse Krug Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Barbara Jones, Mary Morris, and Michael R. Slovis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

For shooting two of his co-workers, defendant Xavier Watkins was charged with two counts of attempted first-degree murder, two counts of armed violence, and six counts of aggravated battery. The aggravated battery counts constituted a set of charges for each victim, alleging that defendant committed a battery which caused great bodily harm (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(a)), committed a battery while using a deadly weapon (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(b)(1)), and committed a battery while on a public way (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(b)(8)). Following a bench trial, defendant was found guilty of both charges of armed violence and all the aggravated battery charges. He was sentenced to concurrent terms of imprisonment of 15 years for the armed violence offenses and 5 years for the aggravated battery charges premised on great bodily harm, on the basis that the other aggravated battery charges merged into those two.

On appeal, defendant contends (1) that his multiple convictions violate the one-action-one-conviction rule; (2) that the State failed to prove that he caused "great bodily harm" to one of the victims; (3) that in sentencing him the circuit court considered improper factors in aggravation; and (4) that his sentences were excessive and should be reduced.

At trial, Kevin Garrity testified that on May 19, 1989, he was employed as a carpenter for Madsen Construction, and that at 6:30 that morning he was sitting in a truck at a work site, talking with several co-workers. About 15 minutes later, he noticed defendant walking up the street. When he was approximately seven to eight feet from the truck, defendant pulled out a gun and shot two to three times. Gar-

rity did not see any other weapons at that time, but stated that everyone had tools, including utility knives.

Carlos Escobar testified that he was a laborer for Madsen Construction and that after work on May 18, 1989, he went to a bar with some co-workers. Defendant arrived about 45 minutes afterwards and began arguing with Steven Carlson, the foreman of the construction crew. Defendant pushed Carlson against the wall, placed his hands around Carlson's neck, and began choking him. After the manager of the bar broke up the fight and Carlson left the bar, Escobar asked defendant why he was fighting with Carlson. Defendant responded by punching him in the face "approximately" four times. Escobar responded by punching defendant and knocking him to the ground. Defendant then left the bar.

The next morning, at about 6:45 a.m., Escobar was standing near a co-worker's truck, discussing the events at the bar, when he saw defendant approaching with John Jackson, who walked into a nearby park as defendant continued coming closer. Escobar noticed that defendant's right hand was in his pants pocket. When he was about nine feet away, defendant pulled out a chrome-plated revolver. Escobar could not remember whether he had taken his work knife out of its sheath. When he saw the gun, Escobar began running away, but was struck in the back by a bullet. He fell to the ground and then saw defendant shoot his co-worker Steven Grill. Defendant was aiming at Grill's chest, but Grill managed to swerve so that the bullet merely grazed him. Escobar then noticed blood on the left side of Grill's shirt. Grill tried to run away while defendant shot the rest of his bullets at him. Defendant continued to pull the trigger, even after the gun was empty. Defendant then ran away, and Jackson rejoined him.

Escobar was taken to the hospital where he remained for approximately two months. He stated that he had a colostomy and that he could no longer father children. Since the shooting, he has not been able to return to work.

Robert Johnson testified that he worked for Madsen Construction and that on the morning of May 19, 1989, he was talking with his co-workers about the events at the bar the previous evening. He saw defendant approach the truck, holding his right hand in his pants pocket. When Garrity told Escobar, "I think he's got a knife," Escobar backed up and started to take out his work knife. Defendant then pulled out a gun. Escobar tried to run away, but defendant shot him as he crossed the street. After Escobar fell to the ground, defendant began shooting at Grill, hitting him with one shot; he then pointed the

gun at Grill's head, but he was out of bullets. Defendant then ran away.

Albert Olson testified that at around 6:30 a.m. on May 19, 1989, he was sitting in his truck talking with his co-workers. Escobar, Grill, and Tony Cervin were telling Garrity and him about the events at the bar. Someone then said "there he is" and Olson turned and saw defendant and Jackson about one-half block away. Jackson then went into a park and defendant walked toward the truck. When he was 5 to 10 feet from the truck, defendant pulled out a gun and pointed it at Escobar, Grill, and Cervin. Olson then ducked down behind the steering wheel and heard five or six shots. Although he did not see any of the shooting, Olson did see defendant aim at Grill's head and pull the trigger after the gun was empty.

Steven Grill testified that after work on May 18, 1989, he went to a bar with some of his co-workers. About one-half hour after defendant's arrival, Carlson and defendant started arguing and began pushing and shoving each other. Grill broke up the fight and Carlson left the bar. Defendant then offered to bet $200 that "whoever he fought that night wasn't going to walk out of the bar." A short time later, when defendant and Escobar began to argue, Grill hit defendant because he "was punched *** [when he] tried to get between the two [men]." The manager of the bar then asked everyone to leave.

At work the next morning, Grill was discussing the prior night's events with his co-workers. He was worried that he might lose his job because defendant was a foreman on the crew. A few minutes later, someone noticed that defendant was approaching them with his hand in his pocket. Because they thought defendant was holding a knife, they pulled out their work knives, but put them back as soon as defendant pulled out the gun. When he was about 20 feet away from Grill, defendant began shooting at him and at Escobar and Cervin. Everyone scattered, but Grill was grazed on his left side just above the belt, causing holes in his sweatshirt and tee-shirt. Grill kept running and fell to the ground to get out of the line of fire. Defendant then came up to him, placed the gun about 18 inches from his face, and pulled the trigger. The gun was empty, however.

On cross-examination, Grill stated that he had been working with defendant for approximately two weeks prior to the shooting, and that they had had "words" twice on the job. Grill also stated that Carlson, rather than defendant, was his foreman.

The State then rested. The circuit court acquitted codefendant Jackson of all charges and denied defendant's motion for a finding of not guilty at the end of the State's case.

Steven Carlson testified for the defense that he was the general foreman for Madsen Construction and that on May 18, 1989, defendant arrived at the bar after everyone else. About one-half hour after defendant arrived, they began arguing about work. During the argument, defendant grabbed him by the neck and pushed him against the wall. Grill separated them, and he left the bar and went to the hotel where he shared a room with defendant. He and defendant had shared a room for a couple of months, but the room was registered in his name. Later that evening, he was sitting in the hotel bar when defendant came in and started another fight, during which defendant grabbed him by the throat and threw him to the ground.

Defendant testified on his own behalf and stated that in May 1989, he worked as a carpenter foreman for Madsen Construction and commuted from Milwaukee to the work site in Evanston for 1½ months until he began renting a room with Carlson. On May 18, 1989, he arrived at the bar and began arguing with Carlson, pushing him against the wall. Escobar and Grill then grabbed him and broke up the fight. He stayed at the bar for another one-half hour because Escobar and Cervin were waiting outside for him for approximately 20 to 25 minutes. After they reentered the bar, Escobar and Grill approached him and told him that they "wanted to kick [his] ass." At the same time, Cervin and another co-worker were taking bets as to who could beat defendant. Escobar then began "poking" his chest while Grill stood behind him and held his shoulders. After getting poked three times, he punched Escobar, and then was beaten by him. When the fight was broken up, he left the bar and went to the hotel where he was staying.

At the hotel, defendant confronted Carlson in the bar because he thought Carlson told Escobar and Grill to attack him. He grabbed Carlson and threw him to the floor. Someone called the police; when they arrived, Carlson said that he no longer wanted to share a room with defendant. Because the room was registered to Carlson, the police told defendant to remove his belongings and turn in his key. He then gathered his belongings and spent the night in a park near the work site. In order to protect himself, he took a .32 caliber revolver from his bags and placed it in his pocket. He stated that he had owned the gun for approximately 10 years and that it had only three bullets.

The next morning, defendant woke up at about 6:40 a.m. and walked to the work site with the gun still in his pocket. As he approached the site, he noticed everyone standing around a truck. When he was only 2½ feet away from the truck, Escobar "sudden[ly]" ap-

peared, brandishing a knife and saying "we have knives this time." He reached for his gun, but had difficulty removing it from his pocket. He tried to run away, but Escobar and Grill chased him with their knives. When Escobar lunged at him with the knife, he pulled out the gun and fired at Escobar, who was only two feet away. Escobar twisted and was struck in the back. He then turned around and tried to run the other way, but ran straight into Grill. He fired a shot straight down and then one at Grill's side. Grill turned and began to run, but he chased Grill and pointed the empty gun at his head and pulled the trigger. He stated that he did this because he was still afraid, and he hoped that he would be able to make Grill "flinch" so that he would have time to escape. He also stated that he did not arm himself with the intent to harm anyone, and that he pulled out the gun because he was fearful for his own safety.

On cross-examination, defendant stated that Escobar and Cervin told him to come outside with them after Carlson left the bar. He also stated that they were waiting outside for him only five to seven minutes, and began pushing and shoving him as soon as they reentered the bar.

The circuit court found defendant not guilty of attempted first-degree murder, but found him guilty on both counts of armed violence and all six counts of aggravated battery, specifically rejecting defendant's self-defense theory. The court ruled that four of the counts of aggravated battery merged into the two counts charging great bodily harm.

At the sentencing hearing, the court denied defendant's post-trial motion and heard arguments in aggravation and mitigation. The State argued that defendant should be incarcerated for a term in excess of 20 years because he had stalked two people with a gun, permanently disabled one person, struck another, and continued to fire the pistol despite the fact that it was empty. Defense counsel argued that defendant's actions were in self-defense and that he had no prior criminal record. Defense counsel also argued that the court should not consider the evidence of Escobar's permanent disability. Defendant spoke on his own behalf, apologizing and expressing remorse for his actions.

The court then stated that it would not consider the evidence of Escobar's inability to have children because no medical evidence was presented. The court recognized that defendant had no prior record, but stated that it had to consider the nature of the charges. The court noted that the minimum sentence of six years was inappropriate due to the circumstances of the offense, but that the maximum sentence

of 30 years was also inappropriate due to defendant's background. The court then sentenced defendant to 15 years' imprisonment for each armed violence conviction, and 5 years' imprisonment for the two aggravated battery convictions, all sentences to run concurrently.

■ At the outset, we hold, in conformance with the agreement of the parties, that defendant's conviction for the aggravated battery of Escobar must be vacated because it is predicated upon the same physical act as his armed violence conviction. A defendant cannot be convicted of both armed violence and the underlying felony where a single physical act is the basis of both charges. (*People v. Donaldson* (1982), 91 Ill. 2d 164, 170, 435 N.E.2d 477, 478-79; *People v. Camden* (1991), 219 Ill. App. 3d 124, 141, 578 N.E.2d 1211, 1223, *appeal denied* (1992), 143 Ill. 2d 641, 587 N.E.2d 1018.) Therefore, defendant's conviction for the aggravated battery of Escobar based on great bodily harm must be vacated, because the same physical act was the basis of both convictions.

■ ■ We reject defendant's contention that because the circuit court acquitted him of attempted murder, his armed violence conviction should be vacated because the court considered his actions to be unpremeditated. Our supreme court recently rejected an identical argument when it held that a conviction for armed violence was proper even if the underlying offense was unpremeditated. See *People v. Allen* (1992), 153 Ill. 2d 145.

■ Defendant next contends that the State failed to prove beyond a reasonable doubt that he inflicted great bodily harm when he shot Steven Grill. He asserts that the evidence established that the bullet only grazed Grill's chest and caused holes in his clothing. Defendant concedes that Grill suffered bodily harm, but argues that his injuries did not rise to the level of great bodily harm and therefore his convictions for aggravated battery and armed violence predicated on aggravated battery in causing great bodily harm must be vacated. We agree.

Infliction of great bodily harm is an essential element of aggravated battery under section 12—4(a) of the Criminal Code of 1961 and therefore must be proved by the State. (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(a).) While the law requires that the injury be graver and more serious than that required for an ordinary battery (*People v. Figures* (1991), 216 Ill. App. 3d 398, 401, 576 N.E.2d 1089, 1092), it is the role of the trier of fact to determine if the injuries rise to the level of great bodily harm. (*People v. Cochran* (1989), 178 Ill. App. 3d 728, 738, 533 N.E.2d 558, 564.) However, when a victim merely suffers bodily harm, a conviction for aggravated battery predicated upon

great bodily harm must be vacated. *Figures*, 216 Ill. App. 3d at 402, 576 N.E.2d at 1092.

In *Figures*, the defendant fired a shot which pierced the victim's shoe, but did not penetrate his skin. No evidence was offered that the victim bled as a result of the shot, and the victim himself testified that he received treatment at the hospital for a blood clot. Nevertheless, the circuit court found that the victim suffered great bodily harm. (*Figures*, 216 Ill. App. 3d at 402, 576 N.E.2d at 1092.) On appeal, we held that such a finding was not supported by the evidence and that the victim's injuries merely constituted bodily harm rather than great bodily harm. *Figures*, 216 Ill. App. 3d at 402, 576 N.E.2d at 1092.

Here, defendant fired a shot at Grill's chest, which pierced his clothing and grazed his left side. There is no question that he suffered bodily harm, which has been defined as "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions." (*People v. Mays* (1982), 91 Ill. 2d 251, 256, 437 N.E.2d 633, 635-36.) However, as in *Figures*, we do not believe that the evidence supports a finding that he suffered great bodily harm. The question centers on the injuries the victim actually received (*People v. Costello* (1981), 95 Ill. App. 3d 680, 684, 420 N.E.2d 592, 595), and the record here leaves substantial question regarding the extent of Grill's injury.

Grill did not state that he bled as a result of the shooting, nor did he say that he required medical attention. His characterization of his injury as a "graze" is all that is contained in the record. The only evidence that the bullet caused him to bleed is Escobar's testimony, which, as defendant points out, is questionable because he was lying on the ground after having been shot. Accordingly, because there is no evidence that the bullet affected Grill in any manner other than grazing his side, we vacate the conviction for the aggravated battery count predicated on great bodily harm upon Grill. Likewise, defendant's conviction for armed violence upon Grill must be vacated, because the State failed to prove its predicate offense, which was aggravated battery based on great bodily harm. Nevertheless, because defendant was found guilty of the other aggravated battery charges naming Grill as the victim, either of which was justified by the evidence, we remand this cause for entry of judgment on either of those findings.

Defendant next contends that the circuit court improperly considered in aggravation the harm that Escobar and Grill suffered. Defendant asserts that great bodily harm is implicit in aggravated battery and was considered by the legislature when it set the penal-

ties for the offense. The State maintains that the record reflects that the court properly considered the extent of the injuries. We agree with the State.

While a sentencing court may consider the harm caused by the defendant's conduct (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(a)(1)), it may not consider an aggravating factor which is inherent in the offense. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 271-72, 497 N.E.2d 1138, 1144.) In *Saldivar*, our supreme court held that in a manslaughter case, a court could not consider the fact that the victim died as an aggravating factor, but could consider the circumstances of the death. The court distinguished the end result of the offense, the death, from the "force employed and the physical manner in which the *** death was brought about." *Saldivar*, 113 Ill. 2d at 271, 497 N.E.2d at 1144.

In the instant case, as in *Saldivar*, the record indicates that the circuit court considered the extent of the injuries and the manner in which they were brought about, rather than their mere existence. The court stated that it would "consider the nature of the charges," but only after stating that it would determine "the extent of the injuries." Furthermore, the State's argument in aggravation focused on the circumstances of the offense rather than the harm that was suffered. There is no basis to conclude that the circuit court relied upon anything other than proper factors when it sentenced defendant. Nor is there any basis to conclude that remandment is necessary to allow the circuit court to reconsider the sentence because of the judgments we have vacated. See *People v. Donaldson* (1982), 91 Ill. 2d 164, 170-71, 435 N.E.2d 477, 480; *People v. Kosanovich* (1979), 69 Ill. App. 3d 748, 750, 387 N.E.2d 1061, 1063; *People v. Carmickle* (1977), 46 Ill. App. 3d 112, 115, 360 N.E.2d 794, 797.

■ Defendant's last contention is that his sentences are excessive and therefore should be reduced. Defendant argues that the circuit court abused its discretion when it failed to carefully consider the mitigating factors that he had no prior criminal background, was a high school graduate with four years of carpentry apprenticeship, and that he came from a stable home. The State responds that the 15-year sentence was proper in light of the circumstances of the offense.

A court's imposition of sentence is a matter of judicial discretion and on appeal will not be considered excessive absent an abuse of that discretion. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344, 348.) Furthermore, a reviewing court will not substitute its judgment for that of the circuit court merely because it would balance the factors differently. (*People v. O'Neal* (1988), 125 Ill. 2d 291, 298, 531

N.E.2d 366, 369.) However, this balancing process requires careful consideration of all the factors in aggravation and mitigation, as well as the nature and circumstances of the offense. *People v. Center* (1990), 198 Ill. App. 3d 1025, 1033, 556 N.E.2d 724, 729.

Here, the circuit court considered the circumstances of the offense, defendant's rehabilitative potential, his age, and his background. The court concluded that the maximum sentence of 30 years' imprisonment was inappropriate and sentenced defendant to 15 years instead. There is no indication in the record that the court failed to consider any of the mitigating factors and, in light of the circumstances of the offense, we do not believe that a 15-year sentence was excessive.

For the foregoing reasons, the judgment on the armed violence count involving Escobar is affirmed; the judgment on the aggravated battery count involving Escobar is vacated; the judgment on the armed violence count involving Grill is vacated; the judgment on the aggravated battery charge based on great bodily harm involving Grill is vacated; and the cause is remanded for entry of judgment on one of the other aggravated battery counts involving Grill.

Affirmed in part; vacated in part and remanded.

HARTMAN and SCARIANO, JJ., concur.