2021 IL App (2d) 200064-U
No. 2-20-0064
Order filed November 16, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2693 |
| JACOB A. RUBINI, | ) ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) At defendant's trial for home invasion and domestic battery of an intimate partner, defense counsel was not ineffective for calling witnesses who, though testifying that defendant drank and used drugs on the night of the incident, also provided the sole support for key points of the defense theory, such as that defendant had permission to enter the victim's home and that the two later had a physical altercation. (2) The evidence supported the trial court's finding that defendant inflicted great bodily harm on the victim and thus must serve at least 85% of his sentence.

¶ 2     Following a jury trial, defendant, Jacob A. Rubini, was found guilty of home invasion (720 ILCS 5/19-6(a)(2) (West 2018)) and aggravated domestic battery (*id.* § 12-3.3(a)) and not guilty of attempted criminal sexual assault (*id.* §§ 8-4(a), 11-1.20(a)(1)). At sentencing, the trial court

merged the convictions and sentenced defendant to 20 years in prison for home invasion. In addition, the court found that defendant's conduct resulted in great bodily harm to the victim such that defendant would be required to serve at least 85% of his sentence under the truth-in-sentencing provisions of section 3-6-3(a)(2)(iii) of the Unified Code of Corrections (Code) (730 ILCS 5/3-6-3(a)(2)(iii) (West 2018)). On appeal, defendant argues (1) he was denied the effective assistance of counsel, because the only two witnesses called by defense counsel each corroborated the victim's version of the events, added details concerning defendant's drinking and drug use on the day of the offense, and failed to support the defense theory; and (2) the victim's injuries were not severe enough to merit a finding of great bodily harm. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was indicted on, *inter alia*, one count each of home invasion (720 ILCS 5/19-6(a)(2) (West 2018)), attempted criminal sexual assault (*id.* §§ 8-4(a), 11-1.20(a)(1)), and aggravated domestic battery (*id.* § 12-3.3(a)). The charges stemmed from events that took place in the early morning hours of November 25, 2018. According to the indictment, defendant knowingly and without legal authority entered the dwelling of another—the victim, Kathleen Cramer—who was a family or household member, placed himself on top of Cramer with his penis exposed, ripped off Cramer's clothing, and struck Cramer about the head causing great bodily harm.

¶ 5      The matter proceeded to a jury trial on these three charges. During opening statements, defense counsel presented the defense's theory. Counsel asserted that, on November 24, 2018, the day after Thanksgiving Day,[1] defendant entered Cramer's condominium unit (the condo) with legal authority. Counsel stressed that "[t]his case is not about forced entry" and that defendant

_____

[1] Thanksgiving Day 2018 was actually November 22.

entered the condo with Cramer's permission. According to counsel, the evidence would show that, six months earlier, defendant had moved into the condo, that the parties were in a relationship, and that defendant had supported Cramer "financially, emotionally, [and] physically." According to counsel, the evidence would further show the following sequence of events: (1) defendant and Cramer spent Thanksgiving Day and evening together; (2) the next day, Cramer, "in a fit of jealousy," asked defendant to leave; (3) defendant left as asked; (4) defendant returned later that evening "because he cared"; (5) Cramer and defendant later argued; and (6) defendant then left again. Counsel argued that defendant did not force his way into the condo, sexually assault Cramer, or cause her great bodily harm.

¶ 6 Cramer testified as follows. She was 62 years old and lived at the Harbor Club condominium complex in Wauconda in a ground-floor unit that she owned. Cramer's 29-year-old daughter, Jacqueline Lutz, lived with her. The condo was accessible through a front door and two sliding glass patio doors—one to her bedroom and one to the living room—which were located in the back of the unit and which opened to a grassy area. Each door had a separate key.

¶ 7 Cramer testified that she met defendant, who was approximately 37 years old, in the summer of 2018, when she was walking home from Jewel in the rain carrying groceries. Defendant stopped to offer her a ride. She accepted and he drove her home. They exchanged phone numbers, met for coffee about a week and a half later, and began a dating relationship. At that time, defendant lived in a house on Kimball Avenue that was in foreclosure (the Kimball house). In July 2018, defendant moved into the condo with Cramer. Over several weeks, defendant moved an office chair, a file cabinet, and all his clothing into the condo. Cramer obtained a parking sticker for defendant to use from the condominium association. Cramer and defendant had a sexual relationship, and they shared Cramer's bed. When defendant moved into the condo, Lutz moved

into the Kimball house, where she lived over the next four months with two roommates. Defendant never had any keys to the condo; Cramer would leave the doors unlocked when she was not there. Cramer testified that defendant was supposed to make monthly payments to her, but she never received any money from him. Cramer paid the condominium association fees and the utilities. She also paid for the groceries.

¶ 8     Cramer testified that, in November 2018, defendant moved out of the condo. Cramer stated:

"I asked him to—that he needed to start helping me financially, and I had said that this—the situation wasn't working out and I hope that we could continue to have a relationship but he needed to move to one of his other properties. He had several other properties, he told me."

Cramer testified that this conversation took place about a week and a half before Thanksgiving, though she had asked him for help several times before. According to Cramer, defendant moved out while she was attending a treatment session at Rosecrance. (Cramer was a recovering alcoholic. In November 2018, a charge of driving under the influence of alcohol (DUI) was pending against her and she was wearing a "SCRAM bracelet" (Secure Continuous Remote Alcohol Monitor) on her ankle to monitor her alcohol intake. The case had since been resolved and Cramer was currently on probation. She no longer wore the SCRAM bracelet but was required to check in monthly with a probation officer.)

¶ 9     Cramer testified that she had additional contact with defendant after he moved his belongings out of the condo. She had defendant over for Thanksgiving dinner. Though defendant was not then residing with her, she still cared for him. The dinner was "amicable." Cramer and defendant had sex that evening, and defendant spent the night with her in her bed. On the Friday after Thanksgiving, defendant left the condo, telling Cramer that he was going to work. Cramer

next saw defendant outside her patio door. Cramer could not recall what time it was, but it was still light outside. Defendant told Cramer that "he was taking his van and that [she] shouldn't treat people the way [she] treat[ed] them." No prior argument had occurred, and defendant did not ask to stay with her again.

¶ 10 Cramer testified that, after defendant left on Friday, she remained at the condo. She did not consume any alcohol. Cramer went to bed at about 10 p.m., wearing only a black camisole. Her cell phone was on her nightstand next to her bed. All the doors to the condo were locked and none of them had any damage. Cramer fell asleep on her stomach. She woke up with defendant on top of her, pinning her down. She told defendant to get off of her and he said " 'there's a problem.' " Cramer thought that possibly something was wrong with her daughter and asked if Lutz was okay. Cramer asked defendant how he got into the condo. Defendant told her: " 'The doors were open.' " She told him that the doors were not open. Cramer testified that she felt defendant's hard penis next to her buttocks and that his penis was outside of his clothing. Cramer testified: "I reached around and grabbed it and yanked it and squeezed it and pulled it as hard as I could." She was trying to get him off her. Defendant's penis did not touch her vagina or anus. Cramer testified that defendant started hitting her about the head and face with his hand and telling her to be nice. When asked whether defendant's hand was in a fist, she replied: "I believe it was slapping." She testified that it hurt and that she was screaming for help. Defendant kept saying: " 'Are you going to be nice? This is my pussy.' " He said this at least 20 times.

¶ 11 Cramer testified that, after she grabbed defendant's penis, defendant "threw her across the room" and she landed next to her closet. Cramer hit the closet and wall with the right side of her body. Defendant then threw Cramer back on the bed and continued to hit her on her face and the back of her head. Cramer testified that it hurt and that she was screaming for help. As defendant

threw Cramer back on the bed, he ripped off her camisole, leaving her completely naked. At one point, defendant knelt on Cramer and her face was in a pillow. Cramer began to hyperventilate. In addition to hitting her, defendant pulled Cramer's hair at some point during the attack. After defendant threw Cramer back on the bed, he continued to say, " 'Are you going to be nice,' " and " 'This is my pussy.' "

¶ 12     Cramer testified that defendant "kind of released [her] when he felt blood." Cramer rolled off the bed and, after she caught her breath, she grabbed her robe and ran out the door. It was about 1:30 or 2:00 a.m. Cramer pounded on her neighbor's door. Her neighbor, Dean Stewart, answered the door and she asked him to call the police. Cramer testified that defendant walked out of the sliding glass patio door and waved at them. Defendant told Stewart that everything was fine. Stewart brought Cramer into his condo and called the police.

¶ 13     Cramer testified that, when the police arrived, they escorted her back to her condo. She did not realize that anything was missing until she looked for her phone after the police left. She noticed that the phone and her black camisole were missing. When Cramer was looking in the kitchen for her phone, she found a crowbar next to the refrigerator. The crowbar was not hers, and she had never seen it before. Also at that time, Cramer noticed damage to one of the patio doors. Cramer wrapped the crowbar in plastic and brought it to the police station, walking four blocks to get there.

¶ 14     Cramer testified that she went to the hospital that morning. She had "[s]oreness" and "[a] little difficulty chewing." X-rays were taken at the hospital. She was treated and released. She took Tylenol for the pain.

¶ 15     Cramer identified People's exhibit Nos. 1 through 38 as police photographs: (A) exhibit Nos. 1 through 5 were taken at her condo within an hour of the offense and showed blood, bruises,

and rug burns on her face and bruises on her ear; (B) exhibit Nos. 6 through 10 were taken the day after the offense and showed injuries to her ear, cheek, nose, and forehead, as well as a wound behind her ear; (C) exhibit Nos. 11 through 21 were taken several days after the offense and showed bruising to her face, left ear, shoulder, collar bone, and upper arm, as well as scratches on her neck; (D) exhibit Nos. 22 and 23 were also taken several days after the attack and showed a bald spot on her head where defendant ripped her hair out; (E) exhibit Nos. 24 through 38 were taken the day after the attack and showed (1) blood on her bedsheets, pillow, and mattress cover, objects on the bedroom floor that had been knocked off the wall, and a broken crucifix on a nightstand; and (2) the exterior of her condo, including the sliding glass door that she ran out of. Cramer also identified People's exhibit No. 68 as her ripped camisole and People's exhibit No. 77 as the crowbar that she found in her kitchen.

¶ 16     Cramer testified that she did not give defendant permission to enter her condo on November 25, 2018, that he had no reason to enter her home, and that she did not know why he entered her home.

¶ 17     On cross-examination, Cramer testified that, when she met defendant, her driver's license was suspended due to a DUI. When defendant moved in with Cramer, he stayed with her in her bedroom and kept his clothing in her room. Cramer testified that, on Thanksgiving, Lutz helped her make dinner. Lutz did not eat Thanksgiving dinner with Cramer but instead went to Lutz's father's house. Cramer did not drink alcohol on Thanksgiving. After Cramer and defendant ate dinner, they watched television together. Defendant spent the night with Cramer, and they had sex.

¶ 18     Cramer testified that defendant told her that he had three properties in Wauconda. When she told him to leave, she said, " 'You need to leave and go to your other properties.' " Cramer never gave defendant keys to her condo; Cramer or Lutz would let defendant into the condo or

leave the door unlocked for him. Cramer identified Defendant's exhibit No. 2 as a photograph of cigarettes, a CD, and a set of keys. She did not recognize the keys.

¶ 19    Cramer testified that the condo doors were locked when she went to bed on November 24, 2018. When she asked defendant how he got in, he told her that the door was open. Cramer never told the police or the doctor who treated her that she was sexually assaulted. Cramer testified that the police did not find the crowbar; she found it, wrapped it in plastic, and brought it to the police department. Defense counsel showed Cramer Defendant's exhibit No. 4, which he described as a "Facebook picture" and asked her to if she recognized it. Cramer testified that it was a photograph of her patio chair with a hawk on it. The photograph also showed the damage to the sliding glass door. Cramer testified that Lutz took the photograph on September 20, 2019, and that the door had not yet been repaired. Cramer testified that defendant had a parking permit for the condo.

¶ 20    On redirect examination, Cramer testified that all three doors in the condo were locked when she went to bed. When she ran out of the condo to find help, the sliding glass patio door was "wide open." About 30 minutes to an hour after the police left, she found the crowbar and noticed damage to the sliding glass door.

¶ 21    On recross examination, Cramer testified that when she returned to her condo from Stewart's house with the police, the sliding glass patio door was closed and locked. She did not lock the door. She had to enter through a front window.

¶ 22    Stewart testified that, in the early morning hours on November 25, 2018, Cramer banged on his door and told him that she needed help. She was holding the side of her head and was very upset. He saw a male standing about 50 to 60 feet away, who told him that Cramer did not need any help. Stewart brought Cramer inside and closed the door. Cramer told him that she had been attacked in her condo and they called 911. Stewart saw blood on the side of Cramer's head, and it

looked like some of her hair had been torn out. The police arrived and Cramer left with them. On cross-examination, Stewart testified that Cramer told him that she had been attacked by her ex-boyfriend.

¶ 23    Village of Wauconda police officer Nicholas Weglarek testified that, on November 25, 2018, at about 1:40 a.m., he was on patrol when a call came in regarding a "reddish maroon colored van" in the area of Harbour Club. Officer McClain, who was in a separate vehicle, stopped the van within about one minute and Weglarek arrived about ten to twenty seconds later. Weglarek recognized defendant as the driver. McClain asked defendant where he was going, and defendant responded that "he was getting out of town before he was blamed." Defendant was taken into custody. McClain did not tell Weglarek that defendant was speeding, running red lights, or trying to flee.

¶ 24    Village of Wauconda police officer Jonathan Finze testified that, at about 1:40 a.m. on November 25, 2018, he was dispatched to Harbor Club and directed specifically to Stewart's unit, where he located Cramer, who was wearing a robe. She had "redness all around her face," "dried blood around her nose area," and "a bump on her forehead." Cramer's "left ear *** was also red." Cramer appeared "shaken, frightened." Finze walked with Cramer back to the condo. Cramer attempted to open the sliding door that led to her living room, but it was locked. Finze stood about ten feet away from the door. The lighting was "[v]ery dim," and Finze did not shine a flashlight on the door or make any observations about it. Finze and Cramer walked to the front door of the condo, which was also locked. The front window was open, and Cramer gave Finze permission to enter the condo through the window. Finze then opened the front door of the condo for Cramer.

¶ 25    Finze checked the condo to see if anyone was present. In the bedroom, Finze observed that the bed was in disarray and pictures on the wall above the headboard were not straight. There was

blood on the sheets and pillows and a broken crucifix on a nightstand. Finze called Cramer's cellphone to locate it in the apartment but did not hear a ring. Finze was unable to locate Cramer's black camisole. Finze sat at the kitchen table to go over the incident with Cramer. Other than glance around, he did not do a detailed search of the kitchen. Finze took photographs of the bedroom and Cramer.

¶ 26    Finze went to the police station and spoke with defendant. Finze observed scratches and red marks on defendant's upper arm area. Finze also observed what he believed to be blood on defendant's right forearm, which defendant attempted to wipe off when Finze left the booking room. Finze identified People's exhibit Nos. 69 through 73 as photographs of defendant and his injuries, namely red marks on his nose and neck and scratches on his forehead and upper arm.

¶ 27    On cross-examination, Finze testified that, during the preliminary investigation, Cramer referred to only an attempted sexual assault. Thus, Finze did not collect the sheets from Cramer's bed to check for bodily fluids. Finze also did not direct Cramer to a sexual assault counselor. Finze did not check for DNA or fingerprints on the patio door because he "didn't know if it was a break-in or anything of that nature." Finze was not asked to take photographs of the damage to the patio door, because "that was not known at that time," and he had not looked closely enough at the door to notice damage. Finze did not see any type of crowbar at Cramer's house.

¶ 28    Village of Wauconda police sergeant Timothy Burke testified that Cramer brought a "[p]ry bar" wrapped in plastic wrap to the police station. Burke then went to the condo to look for signs that the pry bar was used to gain entry. Burke identified People's exhibit Nos. 39 through 49 as photographs he took showing damage to the patio door. Burke opined that "the rear sliding glass door was pried from the outside on the deck area bending the door interior, bending forward so to speak." Burke testified that he observed, on the ground directly below the damage to the door,

"[p]arts of the wood from the door and what appeared to be metal flake and/or shavings." He testified that this was "more in the interior" of the door. The damage did not appear weathered.

¶ 29 On cross-examination, Burke agreed that his police report made no mention of wood or metal shavings. In addition, he agreed that his report did not specifically mention that a crowbar was used to pry open the door. Burke never made a comparison between the crowbar that Cramer brought to the police station and the marks on the door. Burke did not do any fingerprint analysis. There did not appear to be any damage to the door latch.

¶ 30 On redirect examination, Burke explained that no fingerprint analysis was done because defendant had had access to the unit many times before the incident and thus the presence of his prints would be inconsequential.

¶ 31 Lake County deputy sheriff Andrew Markoya testified that no fingerprints were recovered from the plastic that was wrapped around the crowbar. Two latent fingerprints were recovered from the crowbar and sent to the crime lab. Anthony Spadafora from the Northeastern Illinois Regional Crime Lab testified that he received the fingerprints for testing and that they were not suitable for comparison.

¶ 32 Village of Wauconda police officer Kristan Kolar testified that she and Finze searched defendant's van. She identified People's exhibits Nos. 50 through 63 as photographs taken by Finze during the search. She identified People's exhibit No. 52 as a photograph of a black camisole on the floor of the van. She identified People's exhibit No. 62 as a photograph of a drawer located under the passenger seat that contained a cell phone matching the description provided by Cramer. On cross-examination, Kolar testified that Cramer subsequently verified that the cell phone was hers.

¶ 33    Heidi Dehaan, an emergency room nurse at Good Shepherd Hospital, testified that, on November 25, 2018, at about 9:30 a.m., she treated Cramer, who told Dehaan that she had been in an altercation with her ex-boyfriend. Dehaan asked Cramer to rate her pain on a scale of 1 to 10, with 10 being the worst pain she had ever had, and Cramer rated her pain as a 7. Cramer showed no signs of being intoxicated. A CAT scan was performed of Cramer's head. On cross-examination, Dehaan testified that Cramer arrived at the hospital with a friend. Dehaan did not see any blood on Cramer, and she did not report any bleeding from her ear or nose. Dehaan observed redness and swelling to Cramer's ear and bruising on her forehead and cheek area. Dehaan testified that the bruising was "fairly new."

¶ 34    Michael Braun, an emergency room doctor at Good Shepherd Hospital, testified that Cramer complained of being struck in the face and had bruising. A CAT scan revealed a "zygoma fracture," which he explained was "essentially a cheek bone fracture," along with swelling and bruising. Braun testified that a cheek bone fracture would be caused by "some sort of force." Braun was shown People's exhibit No. 6 and testified that the injuries to Cramer's cheek and ear looked "acute," meaning that they "happened over a short time period." On cross-examination, after reviewing his records, Braun testified that Cramer reported being assaulted by her ex-boyfriend at her condo that morning and that the police told her to go to the hospital. Braun's notes did not reflect that Cramer reported being in any pain. Braun was asked whether Cramer's cheek fracture was a "complex type of fracture," and Braun responded that it was not, because "[i]t appears as one broken bone."

¶ 35    Valerie Whittle, an employee of SCRAM Systems of Illinois, testified that SCRAM bracelets test for alcohol every half hour and can detect tampering. Cramer's bracelet showed no alcohol consumption or tampering from November 23 through 25, 2018.

¶ 36    Christopher and Erika Maves each testified about phone calls received from defendant while he was in jail awaiting trial. Christopher had known defendant for 10 to 15 years through work. Erika knew defendant through Christopher. Christopher testified that, on December 1, 2018, he received about three or four calls from defendant. Defendant asked Christopher to have their mutual friend, Dave, "go over there and talk to [Cramer]" and to have her "drop the charges." Erika testified that she facilitated a three-way call with a phone number provided by defendant. Various recorded phone calls were played for the jury.

¶ 37    Defense counsel presented two witnesses. The first was Lutz, who testified that she met defendant in July 2018. Lutz moved into the Kimball house at the end of August 2018 when defendant moved in with Cramer. Defendant shared a bedroom with Cramer. Lutz visited Cramer about once a week at the condo. On one occasion, Lutz saw defendant's vehicle parked in the "designated parking spot to the condo." Lutz testified that defendant was living at the condo on Thanksgiving. Asked how she knew defendant was living there then, she replied, "He had been living there." Lutz did not go to the condo on Thanksgiving or help Cramer prepare Thanksgiving dinner. Lutz spent the holiday with her father.

¶ 38    Counsel asked Lutz who was present at the Kimball house on November 24, 2018, the day before the offense. Savage arrived at some point and spent the night. Lutz recalled that Savage drove a sedan. According to Lutz, defendant arrived "between 8:00 and 9:00" in the evening. When counsel asked what defendant "was doing on that day," Lutz responded: "That night he came over because he said that he needed to stay because my mother had kicked him out." Lutz then added: "And he was drinking and smoking weed with my roommates." Lutz testified that defendant left in his van "[p]robably between 12:00 and 1:00" in the morning.

¶ 39 Defense counsel showed Lutz People's exhibit No. 77, the crowbar, and asked Lutz if she had ever seen it before. Lutz responded: "It looks like one that my mom had a long time ago maybe. I don't know." Lutz testified that defendant gave her a single key to the Kimball house when she moved in. At that time, Lutz returned her condo keys to Cramer. Defense counsel showed Lutz Defendant's exhibit No. 2, a photograph of keys, and asked if she recognized them. Lutz responded: "Those are not my keys." Lutz identified a photograph of the patio doors on the condo, and counsel asked if the doors are always locked. Lutz responded: "It's normally locked at night, yes, every night." Counsel showed Lutz Defendant's exhibit No. 4 and asked if and when Lutz took the photograph. Lutz responded that she took the photograph on September 20, 2019. Lutz testified that the damage to the door shown in the photograph took place on "November 25th or 24th, whatever day that was."

¶ 40 On cross-examination, Lutz testified that, when she moved into the Kimball house, she brought all her belongings. She lived there with her boyfriend and two roommates. She met Savage through defendant. Savage stayed at the Kimball house for a few days. On November 24, 2018, defendant told Lutz that he needed a place to stay. Lutz did not want him to stay at the Kimball house, but defendant told Lutz that he would evict her if she did not let him stay there. Defendant came to the Kimball house during the late afternoon and "was hanging out with [Lutz] and her roommates." Defendant was drinking "Hennessy and beer" and smoking marijuana. Lutz did not know how much defendant drank but stated that "[h]e definitely was not sober." When Lutz moved into the Kimball house, she did not give her keys to the condo to defendant. She had "no idea" if defendant had keys to the condo.

¶ 41 Defense counsel next presented Savage. Savage testified that defendant was her neighbor about eight years ago. On November 24, 2018, she had been living in a nursing home for about

five months, because she was unable to get an apartment due to having bad credit. Defendant picked her up and allowed her to stay at the Kimball house. She stayed there for three days, from November 24 to 26, 2018. On November 24, 2018, Savage left the Kimball house with defendant at about 10 a.m. They went to the forest preserve and then to the bank. They returned to the Kimball house at about 12 or 1 p.m., where defendant fixed a broken water line. At about 7 p.m., the police came to check on her because she left the nursing home without signing out. Savage then went to pick up her car from a friend. After doing so, she drove defendant to the condo and dropped him off at about 10 p.m. Savage then returned to the Kimball house. Counsel asked Savage where defendant was living at that time. Savage responded: "He was living with [Cramer]."

¶ 42    On cross-examination, Savage testified that she used to live on Kimball Avenue and that she and defendant were friends. Savage testified that she did not see defendant consume any alcohol on November 24, 2018. The State next asked Savage whether, during a phone call with defendant on January 3, 2019, she told defendant, " 'Well, I knew bad things were going to happen because you had drank from morning till night,' " and whether defendant responded, " 'Yeah.' " Savage admitted that she remembered the call. She claimed that she "wasn't watching exactly what [defendant] was drinking" on November 24, 2018. However, she believed that defendant was under the influence of alcohol on that date.

¶ 43    On redirect examination, Savage testified that she did not see defendant smoke marijuana on November 24, 2018. When she dropped defendant off at the condo, his van was at the Kimball house.

¶ 44    In closing, the State argued, *inter alia*, that Cramer owned the condo and that she paid the taxes and utilities. The State pointed to Lutz's testimony that defendant had come to the Kimball house on November 24, 2018, because Cramer had kicked him out of the condo. The State also

noted Savage's testimony that defendant had been drinking. Relying on Lutz's and Savage's testimony, the State argued: "So the defendant had been kicked out of the house, and he stewed about it all day, had been drinking, smoking. And he was upset. So what did he do? Took his van and drove over to [Cramer's] house." When arguing the elements of home invasion to the jury, the State also pointed to Cramer's testimony that she kicked defendant out of the house. The State commented:

> "How do we know that? [Cramer] told you. How do we also know that? Because Defense witness, Jackie Lutz, also told you, Yeah, my mom had kicked him out, so he was staying at his [Kimball house] on the 24th drinking, smoking, having time with his buddies and stewing in the fact he had been kicked out of the house. So he didn't have authority. You know what, he didn't have a key either. But even if he did, who cares? He was told to leave."

The State also pointed to the damage to the door, stating that "[i]f you have authority to enter someone's house, you don't need to break open a door. You really don't. And that's why defendant had to."

¶ 45    Defense counsel contended that there was "no forced entry." He argued that, based on Savage's testimony, defendant arrived at the condo at 10 p.m. on November 24, 2018. According to counsel, defendant and Cramer had a "heated" disagreement at 1 a.m. the next morning and that "[t]hat's what domestic violence is." Counsel argued that when the disagreement "turned somewhat violent," defendant left. Citing Officer Weglarek's testimony, counsel asserted that defendant was not driving erratically and thus had nothing to hide. Counsel argued that the injuries to Cramer were not caused on November 24, 2018, and that defendant had no injuries on his hands. Counsel argued that when Finske looked around the condo, he never even considered forced entry;

he was investigating domestic violence alone. As for the crowbar, counsel noted that (1) the police had not found it, (2) Cramer brought it to the station, (3) Lutz testified that the crowbar looked like one Cramer could have had, and (4) defendant's prints were not on the crowbar. According to counsel, defendant still lived at the condo on November 24, 2018, as shown by his possession of a parking permit.

¶ 46    The jury found defendant guilty of home invasion (*id.* § 19-6(a)(2)) and aggravated domestic battery (*id.* § 12-3.3(a)) and not guilty of attempted criminal sexual assault (*id.* §§ 8-4(a), 11-1.20(a)(1)).

¶ 47    Defendant filed a "Motion for New Trial and Motion to Vacate Judgement Notwithstanding the Verdict," a "Motion to Define 'Great Bodily Harm,' " and a "Motion for New Trial in Accordance to 735 ILCS 5/2-1401 and Newly Discovered Evidence." The trial court denied each motion.

¶ 48    At sentencing, the trial court merged the convictions and sentenced defendant to 20 years in prison for home invasion. The court found that defendant's conduct resulted in great bodily harm to Cramer, stating: "[R]egarding the issue of bodily harm or great bodily harm, great bodily harm has already been found by the jury and this Court continues to find it very clearly was established." Thus, the court concluded that defendant would be required to serve at least 85% of his sentence (see 730 ILCS 5/3-6-3(a)(2)(iii) (West 2018)).

¶ 49    Defendant filed a motion for reconsideration of the sentence, arguing, *inter alia*, that there was no special interrogatory signed by the jury establishing great bodily harm. The court denied the motion, stating:

"The 85 percent is based on the truth in sentencing rules. They do not require a special interrogatory, never have. I would note that even were that to be the case, in this case the

jury found beyond a reasonable doubt great bodily harm and the agg domestic battery. But even if they hadn't done that, even if it was just home invasion, the trial court makes that finding."

¶ 50     This timely appeal followed.

¶ 51                              II. ANALYSIS

¶ 52                    A. Ineffective Assistance of Counsel

¶ 53     Defendant argues that he was denied his right to the effective assistance of counsel when the only two witnesses defense counsel called—Lutz and Savage—corroborated Cramer's version of the events, added details about defendant's intoxication, and failed to support the defense theory in any way. The State responds that defendant's argument lacks merit because there were strategic reasons to call Lutz and Savage and, in any event, any error in presenting their testimony did not change the outcome of the trial.

¶ 54     To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). That is, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Thus, to establish deficient performance, the defendant must overcome the presumption that, under the circumstances, the challenged action might be a " 'sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1956)). In addition, a defendant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A defendant must satisfy both prongs of the *Strickland* test, and the failure to satisfy either prong precludes a finding of ineffective assistance. *People v. Milton*, 354 Ill. App. 3d 283, 289 (2004).

¶ 55    To prove defendant guilty of home invasion, the State had to prove beyond a reasonable doubt (1) defendant was not a peace officer, (2) defendant knowingly and without authority entered the dwelling place of another, (3) defendant remained in the dwelling place until he had reason to know one or more persons were present, (4) defendant intentionally caused injury to Cramer within the dwelling place. See 720 ILCS 5/19-6(a)(2) (West 2018).

¶ 56    Defendant agrees that, generally, calling a particular witness is a matter of trial strategy. See *People v. King*, 316 Ill. App. 3d 901, 913 (2000) (the decision whether to call a certain witness is "within the realm of strategic choices"). Nevertheless, he asserts that even strategic decisions are subject to challenge where "no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *Id.* at 916. For instance, in *King*, the reviewing court found no reasonable strategy in trial counsel's "failure to call an available alibi witness who would have bolstered an otherwise uncorroborated defense." *Id.* The alibi witness's testimony, if believed, would have made the defendant's commission of the crime impossible for lack of opportunity. See *id.* at 914-15.

¶ 57    According to defendant, no reasonably effective defense attorney would have called Lutz and Savage under these circumstances. We disagree. The crux of the defense theory was that defendant entered the condo with authority. The jury was instructed:

> "[T]he defendant's entry into a dwelling of another is 'with authority' if the defendant enters the dwelling without criminal intent and was initially invited into or received consent to enter the dwelling, regardless of what defendant does after he enters." See Illinois Pattern Jury Instructions, Criminal, No. 11.53A (approved Dec. 8, 2011).

If the jury believed that Cramer invited defendant into the condo, then he entered "with authority," (provided he entered without criminal intent). If the jury believed that Cramer never kicked defendant out of the condo, then defendant did not enter the "dwelling place of another." See *People v. Taylor*, 318 Ill. App. 3d 464, 473 (2000) (where uncontradicted evidence established that the entrant had been staying at the apartment at issue, the entrant did not enter the dwelling place of another). Thus, the jury would not have found defendant guilty of home invasion if they believed (1) that Cramer invited him in (and he lacked criminal intent), *or* (2) that Cramer had never kicked him out of the condo.

¶ 58    Defense counsel made his theory clear during opening and closing arguments. Counsel argued that defendant arrived at the condo at 10 p.m. on November 24, 2018, that defendant and Cramer subsequently had a "heated" disagreement at 1 a.m. the next morning, and that "[t]hat's what domestic violence is." If counsel could establish that defendant entered with Cramer's permission and innocent intent and that the "domestic violence" occurred later, the jury could find him not guilty of home invasion. Given the testimony from Cramer that defendant had moved out, this was a reasonable strategy, especially since Cramer testified that, at the time, she had still cared about defendant and wanted to continue their relationship, which was evidenced by the fact that

they spent Thanksgiving Day and evening together. Counsel argued that there was no forced entry, that the police never even considered forced entry during the initial investigation, and that the police did not see the crowbar. Counsel described Cramer as a "woman scorned" and essentially implied that Cramer was lying, that the crowbar belonged to her and her injuries did not happen that day.

¶ 59    Savage's and Lutz's testimony supported this theory. Savage testified that she dropped defendant off at the condo at 10 p.m. This was the only testimony that supported defense counsel's theory that defendant arrived at 10 p.m. and that the "heated" disagreement happened much later. (We, note, too that, Savage provided the only testimony that, at the time of the offense, defendant still lived with Cramer and, thus, did not enter the dwelling place of another.) Lutz provided testimony that called Cramer's credibility into question. Although Cramer testified that Lutz was at the condo on Thanksgiving and helped Cramer prepare the meal, Lutz testified that she was not at the condo and that she instead spent the day at her father's house. Given defense counsel's theory and implication that Cramer was lying about the incident, any testimony that called Cramer's credibility into question was critical. More importantly, however, Lutz testified that the crowbar, which Cramer found in the kitchen after Finze had completed his investigation and left the condo, "look[ed] like one that my mom had a long time ago maybe." This was the only testimony that supported defense counsel's theory that Cramer was essentially lying about the incident, *i.e.*, the jury could believe that the crowbar belonged to Cramer and that she damaged the door after Finze had left. To be sure, Lutz also testified that "[Cramer] had kicked [defendant] out." However, that testimony was not damaging to the theory that defendant had entered the condo with authority. As noted, even if Cramer had previously asked defendant to move out, the jury could find defendant not guilty of home invasion if the evidence showed that defendant entered

the condo at Cramer's invitation and without criminal intent. In addition, although Lutz and Savage both testified that defendant had been drinking (and Lutz said he was also smoking marijuana), we cannot say that this testimony was so harmful that it outweighed the benefits of their other testimony.

¶ 60    Indeed, without Lutz's and Savage's testimony, the jury would have been left with Cramer's unrebutted testimony about the incident, evidence that a crowbar was found in the kitchen, evidence supporting an inference that the crowbar was used to open one of the sliding glass doors, evidence that defendant was stopped by the police in the vicinity of the condo, and evidence that Cramer's phone and camisole were found in defendant's van. Without Lutz's and Savage's testimony, defense counsel would have had no evidence to support his theory that defendant arrived at the condo at 10 p.m., that Cramer lied about the incident, that the crowbar belonged to Cramer, or even that defendant still lived with Cramer.

¶ 61    In light of all the circumstances, we cannot say that defense counsel's decision to call Lutz and Savage to testify was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Thus, defendant did not receive ineffective assistance of counsel.

¶ 62                              B. Truth-In-Sentencing

¶ 63    Defendant next contends that the trial court erred in finding that defendant must serve 85% of his sentence under the truth-in-sentencing provisions of section 3-6-3(a)(2)(iii) of the Code (730 ILCS 5/3-6-3(a)(2)(iii) (West 2018)). According to defendant, Cramer's injuries were not severe enough to merit a finding of great bodily harm, because the injuries were largely superficial and did not require any significant medical attention.

¶ 64    Prisoners are generally entitled to day-for-day good conduct credit against their sentences. See *id.* § 3-6-3(a)(2.1). However, a person convicted of home invasion "shall receive no more than

4.5 days of sentence credit for each month of his *** sentence" if the court finds that the conduct leading to the conviction "resulted in great bodily harm to a victim." *Id.* § 3-6-3(a)(2)(iii); *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 11. Thus, in a such case, a defendant must serve 85%, rather than 50% of his sentence. *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 11.

¶ 65    Although the term "great bodily harm" does not have a precise legal definition, it requires harm greater or more serious than the bodily harm needed to satisfy an ordinary battery. *Id.* ¶ 13. In *People v. Mays*, 91 Ill. 2d 251 (1982), our supreme court defined the bodily harm needed to satisfy an ordinary battery as "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." *Id.* at 256. Because great bodily harm requires harm greater or more serious than the bodily harm needed to satisfy an ordinary battery, "simple logic dictates that the [harm] must be more severe than that set out in the *Mays* definition." *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991). "Great bodily harm does not require hospitalization of the victim, or permanent disability or disfigurement, but instead centers on the injuries that the victim received." *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 13.

¶ 66    We first address our standard of review. Defendant contends that the issue is one of statutory interpretation and thus asserts that our standard of review is *de novo*. In support, he cites *People v. Salley*, 373 Ill. App. 3d 106 (2007), which applied the principles of statutory construction to determine whether the phrase "a victim" as used in section 3-6-3(a)(2)(iii) of the Code encompassed anyone injured by the defendant's conduct during the enumerated offenses or to only those named as a victim in the charging instrument. *Id.* at 109-13. The State contends that whether a victim's injuries constituted great bodily harm for purposes of section 3-6-3(a)(2)(iii) of the Code is a question of fact. In support, the State cites *Lopez-Bonilla*. The issue in that case, like here, was

whether the injuries suffered by the victim amounted to great bodily harm for purposes of section 3-6-3(a)(2)(iii) of the Code. We stated:

> "Although defendant addresses the issue as one of statutory interpretation and asks this court to find a lack of great bodily harm as a matter of law, whether a victim's injuries rise to the level of great bodily harm is a question of fact. [Citation.] Thus, as long as the evidence was sufficient to support a finding of great bodily harm, the trial court's determination will be affirmed." *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 14.

*Lopez-Bonilla* supports the State's position.

¶ 67    Nevertheless, defendant, in his reply brief, directs us to *People v. Axtell*, 2017 IL App (2d) 150518, where, according to defendant, we "called into question" our holding in *Lopez-Bonilla*. At issue in *Axtell*, was whether the State proved, for purposes of first-degree murder, the defendant's guilty knowledge, *i.e.*, that the defendant knew that his fatal blow to the victim created a strong probability of death or great bodily harm to the victim (see 720 ILCS 5/9-1(a)(2) (West 2012)). *Id.* ¶ 57. In applying the language of the first-degree murder statute, we found that "cases [such as *Lopez-Bonilla*] in which the issue was whether the victim suffered 'great bodily harm' are of little guidance in construing the term as it is used in the murder statute." *Id.* ¶ 65. We noted that *Lopez-Bonilla* "could be read to hold that whether injuries amounted to 'great bodily harm' is a factual question that the fact finder has wide latitude to decide *even on a given set of facts or when the facts of the injury are not in dispute*." (Emphasis in original.) *Id.* In a footnote, we commented

> "In *Lopez-Bonilla*, the issue was whether, at sentencing, the State had proved 'great bodily harm' as a prerequisite to limiting the defendant's good-time credit. We did not set out the defendant's argument but noted only that he 'addresse[d] the issue as one of

statutory interpretation and ask[ed] [the] court to find a lack of great bodily harm as a matter of law.' [Citation.] We then stated that the question was one of fact and that the State had introduced sufficient evidence of great bodily harm. [Citation.] The evidence appears to have been undisputed, but we might merely have been rejecting a proposed *per se* rule about the construction of the term. That we considered ourselves bound to decide whether the evidence was sufficient *could* be taken as implying that whether given injuries amount to 'great bodily harm' is ultimately a question of law. But the opinion is not clear on this matter." (Emphasis in original.) *Id.* ¶ 65 n.1.

We then turned to cases "in which the murder statute was actually at issue." *Id.* ¶ 67.

¶ 68    Other than citing *Salley*, which did not involve the issue here, and our footnote in *Axtell*, defendant makes no argument as to why the appropriate standard of review should be *de novo*. Contrary to defendant's claim, this case does not involve a matter of statutory interpretation. The parties are not disputing the meaning of statutory terms (as was the case in *Salley*) but whether the facts satisfy those terms, specifically whether Cramer's injuries amount to great bodily harm for purposes of section 3-6-3(a)(2)(iii) of the Code. Thus, *de novo* review does not apply. See *People v. Garza*, 2019 IL App (4th) 170165, ¶ 17 (whether defendant was in " 'lawful custody' " for purposes of the escape statute was not subject to *de novo* review as it did not present a question of statutory interpretation). Moreover, as *Lopez-Bonilla* holds, "whether a victim's injuries rise to the level of great bodily harm is a question of fact." *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 14.

¶ 69    We turn now to the merits. Defendant contends that Cramer's injuries were not severe enough to warrant a finding of great bodily harm. He argues that "Illinois case law is replete with cases of far more serious injuries, such as knife wounds and even bullet wounds, that did not constitute 'great bodily harm' because the wounds were merely superficial." See *In re J.A.*, 336

Ill. App. 3d 814 (2003); *In re T.G.*, 285 Ill. App. 3d 838 (1996); *People v. Watkins*, 243 Ill. App. 3d 271 (1993); *Figures*, 216 Ill. App. 3d 398.

¶ 70    The State argues that defendant's cases are readily distinguishable and directs our attention to *Lopez-Bonilla* and *People v. Matthews*, 126 Ill. App. 3d 710 (1984), where the reviewing courts found the evidence sufficient to establish great bodily harm. We begin with the State's cases.

¶ 71    In *Lopez-Bonilla*, the victim was hit and kicked by two men and hit over the head with a gun. *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 5. He felt blood coming from his head. *Id.* His hair was grabbed and his head was thrown back and forth into a desk drawer, with enough force to take chunks of wood out of the drawer. *Id.* A witness saw blood coming from his face. *Id.* ¶ 7. His assailants threw him down, where he lay facedown in blood. *Id.* ¶ 5. He felt like he was losing consciousness. *Id.* The victim refused treatment and was "placed in an ambulance and cleaned up." *Id.* ¶ 7. He suffered various lacerations to the top of his head, left eye, forehead, left arm, and behind his jawbone. *Id.* He also had a neck injury. *Id.* His pain lingered, but he was not sure how long. *Id.* We held that the trial court's finding of great bodily harm was reasonable. *Id.* ¶ 19.

¶ 72    In *Matthews*, the victim was struck on the head with a gun and received several full-force blows on the head and arms with a baseball bat. *Matthews*, 126 Ill. App. 3d at 714. Despite the victim's statement that she " 'only had a bruise on [her] head,' " (*id.*) and the absence of evidence that the victim required medical attention, the jury determined that she had suffered great bodily harm and convicted the defendant of aggravated battery. *Id.* at 712. That finding was affirmed on appeal. *Id.* at 715.

¶ 73    The present case is more like *Lopez-Bonilla* and *Matthews* than defendant's authorities, which are readily distinguishable. In *In re J.A.*, the victim described the single stab wound in the shoulder as "feeling like somebody pinched him," the record was unclear as to the weapon that

was used, and there was no evidence of the extent or the nature of the victim's injury. *In re J.A.*, 336 Ill. App. 3d at 817-18. In *In re T.G.,* the victim received three stab wounds to the chest. He described the first wound as " 'like being poked with a pen or pencil,' " but there was no evidence that he felt the other two wounds. *In re T.G.*, 285 Ill. App. 3d at 846. The victim did not realize that he had been stabbed until he opened his shirt, and there was little evidence regarding the nature or extent of the injuries. *Id.* In *Watkins*, a bullet pierced the victim's clothing and grazed his left side. *Watkins*, 243 Ill. App. 3d at 278. The victim did not state that he bled or that he required medical attention. *Id.* Similarly, in *Figures*, a bullet pierced the victim's shoe but did not penetrate his skin. *Figures*, 216 Ill. App. 3d at 402. The victim described the extent of his medical treatment: " 'they cut the little blood clot open, and then they put iodine on there and patched it up.' " *Id.*

¶ 74    Here, unlike the cases relied on by defendant, the State introduced ample evidence establishing how Cramer's injuries occurred and the extent of those injuries. Cramer's testimony, corroborated by the photographs and by testimony from medical personnel, was sufficient to establish that she suffered great bodily harm. Although defendant argues that *Matthews* is distinguishable because "being slapped and hit repeatedly with an open hand is far from multiple full-force blows with a baseball bat," the evidence presented here established a prolonged attack rather that than just repeated slaps with an open hand. Cramer testified that she woke up to find defendant, who was more than 20 years younger than Cramer and over six feet tall, on top of her, pinning her down. While on top of Cramer, defendant struck Cramer repeatedly on her head and face with his hand. Defendant then threw Cramer across the room, causing her to impact the wall with the right side of her body. Defendant next threw Cramer back on the bed, where he continued striking her on her face and the back of her head. Defendant kneeled on Cramer and her face was

in a pillow. During the attack, defendant also pulled Cramer's hair. Cramer began bleeding during the attack, and she testified that it hurt.

¶ 75    Cramer's testimony was corroborated by photographs showing extensive bruises and rug burns on her face; injuries to her ear, cheek, nose, forehead, and an area behind her ear; bruises on her shoulder, collarbone, and upper arm; scratches on her neck; and a bald spot on her head where hair had been ripped out. Photographs also showed blood on her bed and objects that had fallen from the wall or had broken during the attack.

¶ 76    In addition, Cramer testified that she went to the emergency room later that morning. Dehaan documented that Cramer reported her pain as being a 7 out of 10, with 10 being the worst pain she had ever had. Dehaan observed redness and swelling to Cramer's ear and bruising on her forehead and cheek. Dehaan reported that the bruising looked "fairly new." Braun testified that he ordered a CAT scan and that the report from the CAT scan indicated that Cramer suffered a fracture to her cheekbone. Braun testified that such a fracture would be caused by "some sort of force" and that the injuries to her cheek and ear looked "acute," meaning that they "happened over a short time period." A fractured cheekbone can hardly be deemed superficial.

¶ 77    Based on the description of the attack and the nature of the injuries suffered by Cramer, the trial court reasonably concluded that Cramer suffered great bodily harm (as did the jury for purposes of the aggravated domestic battery conviction see (720 ILCS 5/12-3.3(a) (West 2018)).

¶ 78                                III. CONCLUSION

¶ 79    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 80    Affirmed.